[No. 46705. En Banc. May 29, 1980.]

*In the Matter of the Welfare of* MARCUS JACOB ASCHAUER, ET AL, VICTORIA TAYLOR, *Appellant.*

690

*Slade Gorton, Attorney General,* and *Philip G. Hubbard, Assistant,* for appellant.

*Tim O. Fogh,* for respondent.

*Mark T. Patterson,* amicus curiae.

ROSELLINI, J.—David and Marcus Aschauer (then 4 and 3 years of age, now 6 and 5) were abandoned by their father in a motel where they had been living with him in a filthy room for several months. They were clothed only in diapers when they were observed in the parking lot, which opened upon a busy arterial. Police rescued them, and they were placed in a foster home by the Department of Social and Health Services. Both had diaper rash and cradle cap[1] at that time. On June 1, 1977, upon the department's petition, an order of dependency was entered.

Efforts to locate the father, Peter Aschauer, were unsuccessful, but the mother was found residing in Portland, Oregon, also in a single room. She came to Seattle for a hearing on July 18, 1977, at the conclusion of which it was ordered that the children should remain wards of the court.

Although she had relatives in Seattle, and although she was not employed or attending school in Portland, the mother was unwilling to move to Seattle during the pendency of the proceedings. She did, however, visit the children on several occasions. These visits were conducted in the office of the social worker in charge of the case, who testified at the deprivation hearing held in December 1977, that the children had not appeared to recognize their mother.

The development of these two children was severely retarded, as was apparent to the witnesses who had seen or examined them. A pediatrician from the Children's Orthopedic Hospital testified that they were both afflicted with a

[1]"[C]radle cap *n* : eczema of the crown of the head in infants marked by greasy, gray, or dark brown adherent scaly crusts that often coalesce to form a coating resembling a cap." *Webster's Third New International Dictionary* 528 (1968).

condition known as "psycho–social dwarfism."[2] They exhibited symptoms including retarded physical, emotional, language, and social development. The evidence was that they had been healthy normal babies at birth and that their severe retardation was due to neglect beginning in their first year. The prognosis for their future was not optimistic, but it was thought that if they were provided a stable home environment with persons who would give them proper nurturing, the damage from prior deprivation hopefully could be remedied.

The mother's testimony showed that the family had lived a nomadic life, with no stable base, and one fraught with much dissension between the parents. Their final separation had occurred 12 months before the children were found in the parking lot. A court appointed psychiatrist who examined her found the mother suffering from a mental or emotional disorder involving disorientation and inability to relate to reality. He did not purport to make a specific diagnosis but when her own attorney, questioning him, referred to her condition as schizophrenia, the doctor did not correct him. He was certain that she was not capable of providing adequate parental care to children having the developmental problems exhibited by David and Marcus. He also testified that the mother's own problems were of long duration and could not be readily corrected, if they were correctable at all.

When testifying, the mother revealed that she had taken no meaningful steps to provide a home for the children,

---

[2]Dr. Bettina M. Emerson testified as follows:

"That is a physical condition due to the failure of the family to nurture the child emotionally as much as nutritionally. The child doesn't grow properly. His normal birth is not reinforced by the requirements of the psychosocial area.

". . .

". . . If there is a short period of deprivation, a reversal can take place. If the deprivation is early and severe over a period of time, the process becomes irreversible. . . . Children's brains multiply after birth. If there is neglect during the first year of life, then such children have fewer brain cells as well as smaller brain cells for this multiplication, and after a certain period that cannot ever be reversed." Statement of facts 48–49.

should she be given their custody, or to improve her own prospects for caring for them. She had been involved in vocational rehabilitation and mental health programs in Portland since 1976, but had evidently received no significant benefit from them. At the time of trial she was still unable to support herself financially, and her problems in coping with her environment persisted. She had talked of going to school to learn some means of supporting herself and the children, but her stated goals were vague and generally unrealistic, as were her plans for caring for the children.

Upon this and other like evidence, the trial court found that the children displayed the impact of parental deprivation in their early years of development and are threatened with significant emotional problems in the future; that the mother lacks the ability to meet the physical and emotional needs of the children, and that her emotional problems have taken years to develop and realistically will take years to reverse, if they are reversible. The court found that both parents were unfit to care for these children.

Reluctantly, the court entered an order of permanent deprivation, making the children available for adoption.

Two judges of the Court of Appeals, Division One, reversed the court's judgment, holding that there was no evidence to support the trial court's finding that the mother "has emotional problems which can best be described as a schizophrenic disorder." It was evidently the opinion of the Court of Appeals majority that unless the mother was suffering from schizophrenia, she was capable of caring for the children, or could become capable with some assistance from the Department of Social and Health Services.

We cannot agree with that conclusion. The record is replete with evidence that the persons who had the care and custody of the children from the time of their infancy had not had the ability to meet their physical and emotional needs. There was no contention in this case that the parents deliberately neglected the children, that they had no parental feelings toward them, or that they were actively

cruel to them. It was the evident assumption of all concerned that the parents did their best to care for the children. Adopting that assumption, the condition of the children when they were found, as explained by the pediatrician who examined them, was sufficient in itself to demonstrate that both parents were incapable of giving them the care that they needed.

The evidence further showed that the father had, at the time of trial, abandoned his parental rights. Not only did he leave the children alone in a motel to which he did not return, but he failed to respond to published notice of the deprivation hearing. He was aware that the children were in the custody of the Department of Social and Health Services, for he sent the social worker a note, giving the children's names and asking that they be told that he loved them, but at the same time acknowledging his inability to care for them.

The mother, while she undoubtedly loves the children also and desires to have them with her, has been found, upon substantial evidence, to be likewise incapable of nurturing them. As the trial court found, she is unable to cope with her own problems, much less those of two retarded children. Whether her condition can best be described as schizophrenic, as the trial court found, or can better be described in other diagnostic terms, the fact remains that she lacks the necessary capacity for giving parental care. The evidence was also clear that the prospects for correction of her problems in the near future are very poor, if they exist at all.

We are advised that, in accordance with the court's order, the children were placed in the home of persons who desire to adopt them and who are giving them the nurturing which they sorely need. According to the testimony, stability and attention to their physical and emotional needs are essential if they are to recover from the effects of past neglect. To postpone their access to stability in the hope that the mother will be able to correct deep–seated emotional problems and assume the obligations of parenthood,

when all the evidence shows that she lacks the capacity to do so, is to ignore the desperate needs of the children.

■ This court has repeatedly said that the goal of a dependency hearing is to determine the welfare of the child and his best interests. *In re Becker,* 87 Wn.2d 470, 553 P.2d 1339 (1976); *In re Sego,* 82 Wn.2d 736, 513 P.2d 831 (1973). While the criteria for establishing the best interests of the child are not capable of specification, each case being largely dependent upon its own facts and circumstances (*see In re Becker, supra*), the proof necessary in order to deprive a person of his or her parental rights must be clear, cogent and convincing. *Sego,* at 739. If there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing, an appellate court should not disturb the trial court's findings. Deference paid to the trial judge's advantage in having the witnesses before him is particularly important in deprivation proceedings, when it is borne in mind that continuity in the parent–child relationship, whether the parent figure be the natural parent or not, is increasingly recognized as a significant factor in a child's normal development. *See* J. Goldstein, A. Freud, A. Solnit, *Beyond the Best Interests of the Child* 31 *et seq.* (1973) and articles cited in *Becker,* at 477. For this reason, multiple changes in custody as a result of judicial proceedings are to be avoided if this is possible without harm to the child.

Here, there was ample evidence that the best interests of the children required that they be placed in a home where stability and proper nurturing would be assured, insofar as assurance is possible. Courts are always reluctant to deprive parents of rights with respect to their children, and it is particularly sad when the parent cares for the child and desires to be a good parent, as appears to be the case here. However, it is the court's duty to see that those rights yield, when to accord them dominance would be to ignore the needs of the child.

The Court of Appeals majority erred in holding that the findings were unsupported by substantial evidence.

Two further contentions were raised in that court which were not treated in the opinion. The first is that RCW 13.04.010 (Laws of 1961, ch. 302, § 1, p. 2474) and RCW 13.04.140 (Laws of 1913, ch. 160, § 14, p. 530), pursuant to which the dependency proceeding was conducted, were unconstitutionally vague, inherently subjective, and failed to afford fair notice of the conduct which they proscribed, thus denying the appellant the protection of the due process clause. It was claimed that the phrase "proper parental control" in RCW 13.04.010(2),[3] and the phrase "proper maintenance, training and education" in RCW 13.04.140,[4] were so vague that the use of these statutes as a basis for an order of deprivation denied the mother due process of law.

Two federal district court cases were cited: *Alsager v. District Court*, 406 F. Supp. 10 (S.D. Iowa 1975), *aff'd on other grounds*, 545 F.2d 1137 (8th Cir. 1976); and *Roe v. Conn*, 417 F. Supp. 769 (M.D. Ala. 1976), which cited and adopted the reasoning of *Alsager*.

In *Alsager*, an Iowa federal district court found that the phrases "'necessary parental care and protection'" and "'[parental] conduct . . . detrimental to the physical or mental health or morals of the child,'" contained in the Iowa deprivation statute under consideration, served to inhibit parents in the exercise of their fundamental right to family integrity. *Alsager*, at 18. The court hypothesized that a parent might "follow a rigid scheme of 'discipline–instilling' corporal punishment believing himself in full

---

[3]"(2) Who has no parent, guardian or other responsible person; or who has no parent or guardian willing to exercise, or capable of exercising, proper parental control; . . ." RCW 13.04.010(2), now superseded.

[4]"No dependent or delinquent child as defined in this chapter shall be taken from the custody of its parent, parents or legal guardian, without the consent of such parent, parents or guardian, unless the court shall find such parent, parents or guardian is incapable or has failed or neglected to provide proper maintenance, training and education for said child; . . . or unless the court shall find that the welfare of said child requires that his custody shall be taken from said parent or guardian. . . ." RCW 13.04.140, now superseded.

compliance with the law, only to learn of his folly at a termination proceeding." (Footnote omitted.) *Alsager*, at 18. Supposedly the court recognized that such a "scheme" could reasonably be found to be detrimental to the child, since otherwise it would not be forbidden under the statute. Nevertheless, the court gave tacit approval to such parental conduct. It evidently proceeded upon the assumption that parental choices of disciplinary actions should be free of governmental interference, regardless of their effect upon the child. Such is not the law in this jurisdiction. *See* RCW 26.44, particularly .010 and .020; Laws of 1961, ch. 302, § 1 (effective at all times pertinent to this proceeding, prior to July 1, 1978); and RCW 13.34.

. The *Alsager* court offered no definition of the words "necessary" and "detrimental" which would both satisfy constitutional requirements of specificity, as it conceived them, and yet accomplish the legislative purpose. We are not persuaded by the reasoning of that court.

 While it is true that what is "proper parental care" or "proper maintenance" is subject to value judgments, which may vary from person to person or from judge to judge, these expressions do not stand in isolation. If the statute is viewed as a whole, its meaning takes on substantial objectivity. The statute in question required a showing that deprivation was in the interest of the child's welfare, and thus that the lack of parental attention had resulted in detriment to that welfare. (Laws of 1967, ch. 137, § 1, p. 649; Laws of 1975, 2d Ex. Sess., ch. 71). We have repeatedly said that the welfare of the child is the goal of a dependency hearing (*In re Becker, supra* at 477)[5] and we have

---

[5]In *In re Becker*, 87 Wn.2d 470, 553 P.2d 1339 (1976), we said that criteria for establishing the best interests for the welfare of the child are necessarily absent, since each case presents its own peculiar facts and circumstances, and the complexity of these, as well as the need for individualized treatment, militates against the mandatory consideration of certain specified factors in every case. For the same reason the legislature has not chosen to define the terms objected to here. With developing knowledge and understanding of the needs of children, the criteria for determining what is "proper" or in their best interests also change. For example, it was formerly thought that blood ties between parent and child were

required that proof be made by evidence that is clear, cogent and convincing. In addition, there is available a right of appeal, and upon appeal the sufficiency of the evidence can be reviewed. Thus, deprivation under the act did not depend upon the judgment of a single person.

We are not shown that these protections proved insufficient to shield parents from arbitrary decisions with respect to the welfare of their children and the deprivation of parental rights.

In this case, the appellant was given actual notice of the deficiencies in her parenting. The evidence of lack of care and attention was overwhelming, as the trial court observed. Correction of the mother's problems was highly unlikely within the foreseeable future. The majority of the Court of Appeals did not dispute the evidence, but rather placed the interest of the parent above that of the children, believing that the mother should be given a further opportunity to demonstrate her parental capabilities. We find no merit in the contention that the appellant was deprived of her rights without due process of law.

It is also suggested that the proceedings were void because portions of the statute were repealed after the hearing and the deprivation order was entered. The law in effect when that hearing was conducted has been superseded by Laws of 1977, 1st Ex. Sess., ch. 291, which by its terms became effective on July 1, 1978. Chapter 291 repealed RCW 13.04 in part, amended it in part, and added new provisions, which are now codified in RCW 13.34, the juvenile court act relating to dependency of a child and the

---

extremely important. Now it is learned that kinship is not as important as stability of environment and care and attention to the child's needs. *See* J. Goldstein, A. Freud, A. Solnit, *Beyond the Best Interests of the Child* (1973). These convictions may also change as further study and experience produces new insights. Were the legislature to define the terms in question more precisely than it has already done, the result might well be an inflexibility that deterred rather than promoted the pursuit of the child's best interests.

termination of a parent and child relationship. It is suggested that it was the intent of the legislature that all pending proceedings should be arrested and vacated.

This same contention was made in the case of *In re Frederiksen*, 25 Wn. App. 726, 610 P.2d 371 (1979), and was treated in a scholarly opinion by Judge Turner, sitting pro tempore. We find it unnecessary to add to what was said there. As the Court of Appeals correctly held, the new law, which is described internally as an amendatory act, should be read as a continuation of the old law, with amendments and supplements. It does not deny the court's power to enter deprivation orders, but merely delineates procedural steps, some of which are new.[6] Since the 1977

---

[6] A petition seeking termination of a parent and child relationship may be filed in juvenile court. Such petition shall conform to the requirements of RCW 13.34.040 as now or hereafter amended and shall allege:

(1) That the child has been found to be a dependent child under RCW 13.34.030(2); and

(2) That the court has entered a dispositional order pursuant to RCW 13.34.130; and

(3) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six moths pursuant to a finding of dependency under RCW 13.34.030(2); and

(4) That the services ordered under RCW 13.34.130 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided; and

(5) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; and

(6) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home;

(7) In lieu of the allegations in subsections (1) through (6) of this section, the petition may allege that the child was found under such circumstances that the identity and whereabouts of the child's parent are unknown and no parent has claimed the child within two months after the child was found. RCW 13.34.180.

The record shows that all of these procedural steps were substantially met in this case, save that of subsection (4), requiring a showing that services ordered under RCW 13.34.130 have been offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided. The offering of such services here would have been a futile act. The evidence was that the mother was unwilling to move from Portland, and thus the department could not effectively offer

law did not repeal the power of deprivation but continued it under new procedures, its effect upon pending proceedings in juvenile court which had been commenced but not completed under the former law, was not to terminate them but to allow them to be continued and completed under the new law. The latter governs proceedings occurring after its effective date. Since the hearing here was completed before the effective date of the 1977 law, its provisions do not apply to that hearing.

The judgment of the Court of Appeals, Division One, is reversed and that of the Superior Court for King County is reinstated.

UTTER, C.J., STAFFORD, BRACHTENBACH, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., and HALLOWELL, J. Pro Tem., concur.

her services. It also showed that the prospect of improving her parental capabilities within the foreseeable future was negligible.