# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Dependency of M.N., )
)  No. 71124-5-I
STATE OF WASHINGTON, )
DEPARTMENT OF SOCIAL AND )  DIVISION ONE
HEALTH SERVICES, )
)  UNPUBLISHED OPINION
Respondent, )
)
v. )
)
RACHEL NIEHAUS, )
)
Appellant. )  FILED: July 28, 2014
)

APPELWICK, J. — Rachel Niehaus appeals the order terminating her parental rights to her daughter, M.N. Niehaus argues that the trial court erred in determining that all necessary and reasonably available services were provided to her under RCW 13.34.180(d). She also contends that the trial court improperly found that termination was in M.N.'s best interests. We affirm.

## FACTS

Rachel Niehaus is the biological mother of M.N., born December 22, 2000. Niehaus also has a biological son, A.N. (DOB 5/11/92), and two other biological daughters, C.W. (DOB 1/3/95), and A.L. (DOB 11/11/08). Both A.N. and C.W. were removed from Niehaus's care when they were young. M.N. and A.L. remained in Niehaus's care until July 2011

On July 3, 2011, Niehaus walked in on A.L.'s father, Charles Lee,[1] raping M.N. Niehaus took M.N. away from their apartment to talk to her about what happened, but left A.L. behind with Lee, because she did not believe Lee would harm his own daughter.

---

[1] Lee is not M.N.'s biological father.

M.N. told Niehaus that Lee had sexually abused her on multiple occasions, sometimes when Niehaus was asleep in the next room. Later that night, Niehaus took M.N. to the hospital and reported the assault.[2]

On July 7, 2011, the Department of Social and Health Services (DSHS) filed a dependency petition for M.N., asserting that there was no parent or guardian available to care for her.[3] DSHS requested continued out-of-home placement for M.N. due to the alleged sexual abuse by Lee and Niehaus's failure to protect M.N. The dependency petition stated that, on July 5, 2011, a social worker spoke with fictive kin who had expressed concern to Niehaus a year prior about Lee having sexual contact with M.N. It also detailed two incidents with Child Protective Services (CPS), one in 2007 and one in 2008, in which Niehaus was found to have committed negligent treatment or maltreatment of M.N.

In 2007, M.N. told Niehaus that she had been sexually abused by Niehaus's friend's brother. The alleged abuse had occurred a month and a half earlier, but the issue arose because M.N. had what appeared to be a bladder infection and reported blood in her urine. A medical professional referred the incident to CPS.

The 2008 incident was also referred by a medical professional. Niehaus went to the Providence Intervention Center for a forensic exam after being raped by a man whom M.N. let into the house. The medical professional reported that Niehaus demonstrated anger towards M.N. and told M.N., "[I]t's your fault." M.N. recognized the medical

---

[2] Lee was ultimately arrested and convicted of rape of a child.

[3] DSHS also filed a dependency petition for A.L., which was granted. Niehaus later voluntarily relinquished her parental rights to A.L. A.L. is not the subject of this appeal.

professional, because she had previously been to the center herself for a forensic examination. While at the center, M.N. repeatedly said she had to go to the bathroom but couldn't. As a result, the medical professional feared that M.N. had a urinary tract infection or, worse, a sexually transmitted disease.

During the dependency action, M.N. disclosed that she was also previously sexually assaulted by A.N.—her half-brother—and a man named "Roosevelt." Roosevelt was someone Niehaus knew and said she trusted. M.N. further reported that Lee sexually abused A.L.

M.N. was found to be dependent. She was removed from Niehaus's custody.

M.N. was placed in Ryther Child Center, a residential mental health treatment facility for children. M.N. suffers from chronic mental health conditions such as posttraumatic stress disorder (PTSD), attention deficit disorder, oppositional defiant disorder, and severe anxiety. She also displayed aggressive behavior as a child, throwing a knife at Niehaus at age 2 and kicking Niehaus in the stomach when Niehaus was pregnant with A.L. M.N. was later transferred to Northwest Children's Home in Idaho for a brief period before moving to the Child Study and Treatment Center (CSTC), a psychiatric hospital for children and adolescents in Lakewood, Washington.

In the meantime, Niehaus participated in a number of State-offered services to address her parental deficiencies. These included parenting classes, family preservation services, family voluntary services, parent-child interactive treatment, non-offending family group therapy, supervised and therapeutic visitations, and individual therapy. The social worker initially assigned to her case, Serena Bales, observed that Niehaus was

making progress. In November 2012, DSHS formed a plan to transition M.N. back to Niehaus's care, beginning with overnight visits.

M.N. was scheduled for a visit with Niehaus on November 21, 2012. Bales accompanied M.N. to Niehaus's home that day. While Bales was there, M.N. became upset and aggressive with Niehaus. M.N. was upset because Niehaus said that A.N. might spend Thanksgiving with them, despite the fact that M.N. identified him as a sexual abuser. M.N. ran outside and up the stairs of the apartment building across the parking lot. As Bales watched, M.N. climbed over a balcony railing. Bales was very concerned, because M.N. had a history of discussing and attempting suicide. Bales ran up after M.N. and tried to restrain her while M.N. punched and bit Bales. When the police arrived, they handcuffed M.N. and took her to the hospital. Bales went to the emergency room for her facial injuries from M.N.'s punches.

On March 28, 2013, DSHS petitioned to terminate Niehaus's parental rights to M.N. The petition alleged that Niehaus lacked insight into the needs of M.N., was unable to make safe and protective choices for M.N., and was unable to meet M.N.'s emotional and developmental needs. DSHS acknowledged that Niehaus had complied with all court-ordered services, but stated that there was little likelihood that conditions would be remedied so M.N. and Niehaus could be reunified in the near future. A voluntary guardian ad litem (VGAL) was appointed for M.N. on April 3, 2013.

The termination trial began on October 7, 2013. Niehaus testified on her own behalf. She acknowledged her past mistakes as a parent, such as allowing dangerous men around her children and blaming M.N. for the 2008 rape. Niehaus also addressed her own mental health concerns, including PTSD and depression. She recognized that

DSHS had been involved in her parenting for almost 20 years and that she had requested out-of-home placement for M.N. in the past. However, she stated that she participated in classes and counseling, showed progress, and understood her duties as a parent. She felt that M.N. would be negatively impacted if her parental rights were terminated and feared for M.N.'s safety.

M.N. also testified. She expressed the desire to see and talk to Niehaus regularly. She wanted Niehaus involved in her life because "she means a lot to me and she's helped me through a lot of stuff." M.N. said if Niehaus's rights were terminated and they were not allowed to talk, she would feel depressed and sad, and it would be kind of scary. When asked why she was not living with her mom, she said it was because she was sexually abused and Niehaus beat her. M.N. said that she would like a "forever home" with Niehaus, but named two other people—a temporary foster parent and M.N.'s former preschool teacher—by whom she would also like to be adopted.

The remaining testimony came from professionals who had evaluated or interacted with Niehaus and/or M.N. Niehaus's therapist, Sara Strauss, testified that Niehaus attended and participated in her therapy. Strauss stated that Niehaus acknowledged her role in her children's abuse, although she had not admitted that she was 100 percent accountable. Strauss observed that Niehaus had the tendency to choose abusive partners, an area in which she had made progress but where issues still exist.

Lovenia Warren, a social worker who replaced Bales in December 2012, said that she believed termination would benefit M.N., because Niehaus's emotions strongly affected M.N. and prevented M.N.'s wounds from healing. Warren observed that M.N.

struggled with not knowing what would happen with her mother's parental status and would benefit from the answer to that question, even if it meant termination.

Warren believed that Niehaus could not distinguish safe and unsafe people. As an example, she referenced an incident with a man named "Duane." Duane was a stranger who came into Niehaus's home during an unsupervised visit with A.L. He stayed for an hour asking Niehaus to perform oral sex before he grew tired of being denied and left. Warren concluded that Niehaus was not capable of providing a safe and stable home or providing for M.N.'s emotional needs. In addition, Warren believed that M.N. was adoptable and a very sweet, loving child who was eager to please.

Jenny Travaille, who took over the case from Warren in May 2013, also testified. Travaille expressed strong concern about Niehaus's ability to parent, especially Niehaus's lack of insight into how her own actions impacted her children, her lack of empathy, and her lack of remorse and responsibility for what happened to her children. Travaille identified the "Duane" incident as an example of Niehaus's lack of insight, especially in light of its similarities to the 2008 rape. Travaille also told an anecdote about Niehaus demonstrating a lack of empathy:

> [W]hen [M.N.] first moved to Northwest Children's Home, she went a very long time [without seeing Niehaus], it was a big change for her without having interaction with her mother. I brought [M.N.] to the office. We arranged for there to be a supervised visit. [M.N.] was very excited to see her mother, as there is a bond. Her mom was looking at a magazine. Her mom did not stand up to greet her child. She responded, "Do not hug me too hard."

Travaille acknowledged that Niehaus loves her children, but thought that there was a difference between wanting to do something—in this case, be a fit parent—and having the ability to do it. She said that Niehaus and M.N. have a bond, but one that is not

healthy. She believed that an ongoing relationship with Niehaus was preventing M.N. from "progressing in her trauma narrative" and that M.N. needed permanence to move on. Travaille called M.N. a "spectacular" child, whom she thinks is adoptable, but that continuing her relationship with Niehaus diminishes those prospects.

Skye Camphouse, who served as M.N.'s therapist at Ryther, also acknowledged the unhealthy bond between M.N. and Niehaus:

> They're very connected, however, the relationship does present more of what you would see in sisters or really close friends versus a mother-daughter relationships [sic]. There are not clear boundaries between [M.N.] and [Niehaus]. When [Niehaus] did attempt to set boundaries, [M.N.] would have a difficult time with that and would escalate.

Camphouse testified that the mother-daughter relationship negatively impacted M.N. M.N. displayed "parent parentification," where she assumed the role of a parent, not a child. For example, M.N. often insisted on being part of the adult decision-making process and would express the need to care for her mother and A.L.

Camphouse also testified that she originally held family therapy with M.N. and Niehaus together, but discontinued the joint sessions because they were a significant stressor to M.N. While M.N. was present, Niehaus would sometimes express her difficulty staying committed to being M.N.'s parental figure and her desire to relinquish her legal rights. Camphouse believed that M.N. needed permanence and a very skilled caregiver and Niehaus had not demonstrated that she could provide those things. Camphouse concluded that it would initially be very difficult for M.N. if Niehaus's parental rights were terminated, but that it was still in M.N.'s best interests.

Kristin Steinmetz, the program director at CSTC, also expressed concern about M.N.'s need for a skilled, dedicated caregiver. She called M.N.'s long term prognosis

"guarded," given the severity of M.N.'s behavior and emotional instability. However, she stated that she "can't imagine there'd be any reason" why M.N. would not eventually transfer to a foster home.

Psychologist Dr. Christopher Tobey performed a psychological and parenting evaluation of Niehaus. Based on Niehaus's behavior, such as her reaction to Lee's abuse and her blaming M.N. for the 2008 rape, Dr. Tobey was concerned that Niehaus could not keep M.N. safe long-term. He was also worried that Niehaus's behavior was not improving, noting that the Thanksgiving incident had occurred a year after his evaluation.

Dr. Tobey felt it was unclear how to proceed. He testified that, when children are cut off from their biological parents, they can develop fantasies that they are bad or unloved or that their parents are bad people. However, his concerns with Niehaus were persistent and he felt that permanence was important in M.N.'s life. He testified that early permanence allows children to feel safe and develop a sense of self-identity and self-esteem:

> I mean, it's not uncommon when children experience traumatic insult, that their self esteem and self worth is compromised and they don't think positively about themselves. Because if my own parent won't care for me, who is? And if my only parent doesn't protect me, who will? It's not safe, and I am not worth being taken care of, then what is the value that I see in me?

He expressed that it was very important for M.N. to be able to move on and develop her sense of self. However, he recommended that, if Niehaus's rights were terminated, she should remain involved in M.N.'s life.

The VGAL did not testify, but her report was offered in lieu of her testimony. The VGAL observed that all of Niehaus's children demonstrated difficult behaviors at a very

8

young age and that Niehaus's "responses all seem the same, when the going gets tough she wants to give them away." The VGAL recognized that Niehaus received parenting assistance, but that it did not help:

> Whether Ms. Niehaus is incapable of retaining the skills she learns, or lacks the endurance to apply them for any length of time is unknown. What is known is that her own behavior has had significant negative impact on all four of her children and to this VGAL she seems unwilling or unable to accept the responsibility for her actions and their consequences.

The VGAL recommended that Niehaus's rights be terminated.

The trial court granted DSHS's petition to terminate Niehaus's parental rights to M.N. Niehaus appeals.

## DISCUSSION

A trial court may order termination of parental rights if (1) the State proves the six statutory elements of RCW 13.34.180 by clear, cogent, and convincing evidence; and (2) the trial court finds that termination is in the child's best interests. RCW 13.34.190; In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999). The six statutory elements of RCW 13.34.180 are as follows:

> (a)  That the child has been found to be a dependent child;
> (b)  That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c)  That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d)  That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e)  That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future[; and]
>
> . . . .

9

(f)    That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

Clear, cogent, and convincing evidence is evidence that shows the ultimate fact at issue to be highly probable. K.S.C., 137 Wn.2d at 925. We give deference to the trial court in weighing the evidence and witness credibility. In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Findings of fact must be supported by substantial evidence in light of the clear, cogent, and convincing standard. State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997); In re Dependency of K.N.J., 171 Wn.2d 568, 577, 257 P.3d 522 (2011). Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

I.    Necessary and Reasonably Available Services

Niehaus argues that the trial court erred in finding that all necessary and reasonably available services were provided under RCW 13.34.180(d).[4] This is so, she asserts, because she was not provided a psychiatric evaluation to determine whether medication would improve her PTSD.

At trial, Niehaus alleged that the State failed to provide all necessary and reasonably available services. However, she argued only that she did not receive "intensive" parenting classes.[5] She did not raise the issue of PTSD medication.

---

[4] Niehaus argues that the State failed to prove RCW 13.34.180(e) and (f), because determination of those elements would have been premature without proving RCW 13.34.180(d). Niehaus also assigns error to two corresponding findings of fact: that there is little likelihood that conditions will be remedied so that the child can be returned to the mother in the near future and that continuation of the parent-child relationship clearly diminishes the child's prospect for early integration into a stable and permanent home. Because we find that all necessary and reasonably available services were provided, it was not premature for the trial court to find that RCW 13.34.180(e) and (f) were satisfied.

[5] Niehaus does not renew this argument on appeal.

Nor did any of the witnesses—who included multiple social workers, a psychologist, and Niehaus's therapist—address or recommend PTSD medication. At least one witness, Dr. Tobey, was aware that Niehaus suffered from PTSD and was taking Prozac. However, after evaluating Niehaus and being in the best position to recommend a necessary service, he did not suggest an assessment of or change in her medication.

Niehaus does not dispute that the issue of PTSD medication was not raised below. Instead, Niehaus argues for the first time on appeal that DSHS had reason to know that PTSD medication might be a necessary service. As support, she notes that a "basic internet search" reveals that medication is available and often necessary to treat PTSD. This evidence is outside the record on review. RAP 9.1(a) (record on review may contain report of proceedings, clerk's papers, exhibits, and administrative record). Our review is limited to issues contained in the record. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). We decline to take additional evidence on appeal. RAP 9.11.

The record does not establish that a psychiatric evaluation of Niehaus's PTSD medication was a necessary service. The trial court did not err in finding that all necessary and reasonably available services were provided to Niehaus.[6]

I.   Child's Best Interests

Niehaus challenges the trial court's finding that termination was in M.N.'s best interests. The State must prove by a preponderance of the evidence that termination is in a child's best interests. RCW 13.34.190(1)(b); In re Dependency of A.V.D., 62 Wn.

---

[6] Niehaus also assigns error to the court's finding that additional services would have been futile. She provides no basis for her assignment of error. We decline to review it. RAP 10.3(a)(6); Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011) (declining to consider an inadequately briefed argument).

App. 562, 571, 815 P.2d 277 (1991). Whether termination is in a child's best interests is case-specific and must be decided on the facts and circumstances at hand. In re A.V.D., 62 Wn. App. at 572. The dominant concern is the child's moral, intellectual, and material welfare. In re Adoption of Lybbert, 75 Wn.2d 671, 674, 453 P.2d 650 (1969).

Niehaus first notes that she and M.N. shared a strong bond. Multiple witnesses testified to this fact. However, the testimony also showed that the bond was unhealthy and negatively impacted M.N. Camphouse identified their bond as one that resembled sisters or friends, causing M.N. to prematurely assume a parental role. Travaille testified that M.N. was unable to move on from her past traumas due to her relationship with Niehaus. And, Warren stated that M.N. was strongly affected by Niehaus's emotions, which prevented her from emotionally healing. In this way, the strength of the parent-child bond was actually detrimental to M.N., rather than beneficial.

Niehaus further argues that termination is not in M.N.'s best interests, because M.N. did not have any adoptive prospects and was not capable of integrating into a permanent home in the near future. While multiple witnesses testified that M.N. is adoptable, she does not have a prospective adoptive family at this time. And, it is clear that her road to recovery will be a challenging one. But, this difficult future is a significant reason why professionals concluded that termination was the right outcome. Camphouse testified that M.N.'s unstable emotional state leaves her at high risk for revictimization, meaning that she needs a caregiver with the decision making abilities to ensure that M.N. is safe. Niehaus has consistently demonstrated that she is unable to do so, instead continually exposing M.N. to dangerous people and emotionally jarring situations.

Finally, Niehaus argues that it was unclear whether M.N. would be helped or harmed by the termination. Several witnesses acknowledged that termination may be difficult for M.N. However, Niehaus has significant and chronic parental deficits. She has exposed her children to dangerous men on multiple occasions. DSHS has been involved in her parenting since her oldest child was young, and the State has offered her numerous services including classes and therapy. Niehaus testified that she made progress as a result of the State-offered services she was offered. Both Strauss, Niehaus's therapist, and Julie Larsen, a family therapist who worked with Niehaus and A.L., stated that they had seen some improvement in Niehaus's parenting. But, the testimony overwhelmingly indicates that this progress is not enough to meet M.N.'s needs.

While Niehaus clearly loves M.N., she does not consistently treat M.N. with the discipline and affection of a parent. Instead, she often demonstrates an inability to understand or empathize with M.N.'s emotional state. For example, she was either unaware or indifferent that M.N. would react poorly to seeing A.N., whom M.N. had identified as a sexual abuser. And, she has repeatedly expressed in M.N.'s presence that she cannot or does not want to maintain her role as M.N.'s parental figure.

It is undisputed that M.N. is a high needs child. The testimony shows that she requires a dedicated, skilled caregiver, which Niehaus has not demonstrated herself to be. Moreover, several witnesses testified that M.N. cannot progress in her treatment due to her relationship with Niehaus and Niehaus's uncertain legal status.

We respect the gravity of this conclusion and recognize the love that Niehaus has for M.N. We note that the court left open the possibility that Niehaus could remain in M.N.'s life, should M.N.'s mental health care providers determine that it is in her

therapeutic interest. However, in light of Niehaus's inability to provide adequate care for M.N., we find no error in the trial court's termination of her parental rights.[7]

We affirm.

WE CONCUR:

_____         _____

_____         _____

---

[7] Niehaus assigns error to nine additional findings of fact. She does not identify the nature of her challenges. We do not consider these findings as verities for the purpose of our analysis. See J.F., 109 Wn. App. at 722. However, in the absence of adequate briefing, we will not review the findings individually. See RAP 10.3(a)(6); Norcon, 161 Wn. App. at 486.

Even if we reviewed the findings, our ultimate conclusion would be the same. Read together, the challenged findings generally state that Niehaus has significant parental deficiencies that fail to meet M.N.'s high needs and termination is thus in M.N.'s best interests. As discussed above, the evidence amply supports these findings.