# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

In the Matter of the Dependency of

G.C. (DOB: 12/10/2004),

A Minor Child.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES,

Respondent,

v.

ANDREA CERIO,

Appellant.

No. 71223-3-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: August 11, 2014

LEACH, J. — Andrea Cerio appeals the trial court's termination of her parental rights to her son, G.C. She challenges the trial court's findings that the Department of Social and Health Services (Department) offered her all reasonable and necessary services, that there is little likelihood that conditions will be remedied so that G.C. can return to Cerio, that continuation of the parent-child relationship diminished G.C.'s prospects for early integration into a stable home, and that termination was in G.C.'s best interests. Because substantial evidence supports these findings, we affirm.

FACTS

Andrea Cerio is the mother of two children, G.C., born December 10, 2004, and his half-sister, J.C. The Everett Police Department removed G.C. and J.C. from Cerio's home on November 30, 2010, after a welfare check due to concerns that the children were not receiving adequate nutrition or hygiene care. G.C. was placed with relatives. The Department filed a dependency petition for G.C. on December 3, 2010.

The court entered a contested order of dependency for G.C. on February 10, 2011. The court ordered Cerio to engage in a number of services to remedy her parental deficiencies, including a psychological evaluation with a parenting component, a psychological evaluation update, individual mental health counseling, parent coaching, and anger management treatment.

On July 30, 2012, the trial court dismissed the Department's first termination petition, finding insufficient evidence that the Department offered or provided Cerio all necessary services. The court found the Department's "delay" in not completing the psychological evaluation until September 14, 2011, hindered Cerio's ability to address her parental deficiencies. Additionally, the court expressed concern that the Department had not given Cerio sufficient information about G.C.'s ongoing behavioral problems and special needs, including an evaluation for epilepsy and diagnosis of posttraumatic stress disorder (PTSD), which occurred during the course of the dependency proceedings.

Later review hearing orders document only "partial" compliance on Cerio's part. In a December 6, 2012, order, the court expressed concern about the "length of time the matter has been pending" and found it "imperative" that Cerio engage in the services offered by the Department. Since 2005, she has received 16 referrals to the Department and has refused assistance on "multiple occasions."

The Department offered Cerio psychological evaluations with multiple providers. Dr. Robin LaDue completed an evaluation on September 14, 2011, finding that Cerio suffers from borderline mental retardation. Dr. Kevin Zvilna conducted an evaluation two years later and found that Cerio suffers from a number of conditions, including below average intellect, borderline personality disorder, psychosocial issues, and malingering. While Cerio completed both psychological evaluations, she did not comply with "all recommendations" as the court ordered.

The Department offered Cerio multiple opportunities to take parenting classes. Cerio did not complete one such class because she was "unhappy" with the teaching method. The Department later located a class closer to Cerio. When that class was canceled, the Department offered the same class in two nearby cities. Cerio attended an orientation in October 2012 but did not complete the course.

Cerio participated in some parent coaching sessions offered by the Department. Cerio claimed the "initial parenting coach quit and wouldn't work

with her through no fault of her own," but she made some progress after roughly 40 meetings with another coach, Marie Preftes Arenz. Preftes Arenz reported "an improvement in the quality of interactions that are initiated by [G.C.] toward his mother." Additionally, Preftes Arenz noted that Cerio was "receptive to my prompting of parenting skills and has followed through with most of these prompts." However, at an April 10, 2012, visit between G.C. and Cerio, G.C.'s allegations of physical abuse in his foster home triggered an "angry outburst" from Cerio. After this visit, Preftes Arenz recommended that visits remain supervised. The court later ordered visitation suspended, finding, "Contact with the mother would be harmful to the child's health, safety, and welfare as she is a trigger to his PTSD and contact would impede efforts to address his mental health issues."

The Department referred Cerio to anger management treatment in September 2011. Norman Nelson completed an anger management assessment, recommending 12 individual sessions. Cerio completed approximately eight sessions with him. Nelson testified the services ended when Cerio "withdrew her release of information which means [Nelson] couldn't communicate with anybody." As of December 2012, Cerio had not completed anger management.

The Department has offered Cerio mental health counseling with several providers, but her attendance at these sessions has been intermittent. She attended counseling with Kristin Roessler from June 11 to August 11, 2011, and

Norman Nelson from about November 2011 to January 2012. She claimed that she stopped attending sessions with Nelson because "I was showing up and he was never there." In October and November 2012, she attended two of seven sessions with Dr. Ted Mausshardt, who became "unwilling to work with [her] again due to [her] lack of continued participation in counseling since November." After her dismissal by Dr. Mausshardt, the Department had difficulty locating another provider to meet with Cerio because many of the available providers had been unsuccessful in their efforts to work with her. However, the Department eventually referred Cerio to Julie Larson. She later testified that "[a]ttempts were made to contact [Cerio] [but] we were not able to schedule an appointment and meet together."

At review hearings on March 27, 2013, and September 5, 2013, the court found Cerio noncompliant with court orders and not making progress toward correcting the problems that necessitated G.C.'s out-of-home placement. The trial court terminated Cerio's parental rights to G.C. on November 21, 2013, nearly three years after entry of the dependency order. Cerio appeals.[1]

## STANDARD OF REVIEW

The United States Constitution protects parental rights as a fundamental liberty interest.[2] To terminate a parent's rights, the Department must satisfy a

---

[1] G.C.'s father is not a party to this appeal.
[2] Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

two-pronged test.[3] The first prong requires that the Department prove by clear, cogent, and convincing evidence[4] the six factors enumerated in RCW 13.34.180(1):

> (a)  That the child has been found to be a dependent child;
> (b)  That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c)  That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d)  That the services rendered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e)  That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ;
> . . . ; and
> (f)  That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[5]

The second prong requires the Department to prove by a preponderance of the evidence[6] that termination is in the child's best interests.[7] This court considers the facts and circumstances of each individual case to determine the child's best interests.[8] This court places a "'very strong reliance on trial court

---

[3] In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011).

[4] K.N.J., 171 Wn.2d at 576-77.

[5] K.N.J., 171 Wn.2d at 576-77 n.6 (alteration in original) (quoting RCW 13.34.180(1)).

[6] In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

[7] RCW 13.34.190(1)(b).

[8] In re Dependency of A.V.D., 62 Wn. App. 562, 572, 815 P.2d 277 (1991) (citing In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980)).

determinations of what course of action will be in the best interests of the child.'"[9] Where the rights of a child conflict with the parent's rights, the child's rights should prevail.[10]

This court will uphold the trial court's factual findings if substantial evidence supports them.[11] "'[E]vidence is substantial if, when viewed in the light most favorable to the party prevailing below, it is such that a rational trier of fact could find the fact in question by a preponderance of the evidence.'"[12] In determining whether substantial evidence supports the court's findings, this court does not weigh the evidence or the credibility of witnesses.[13] "Deference paid to the trial judge's advantage in having the witnesses before him is particularly important in deprivation proceedings."[14]

## ANALYSIS

Cerio alleges that the trial court erred when it terminated her parental rights because the Department failed to prove three of the six factors required by RCW 13.34.180(1). Additionally, she claims that the trial court "prematurely" decided termination was in G.C.'s best interests. We reject Cerio's contentions.

---

[9] In re Pawling, 101 Wn.2d 392, 401, 679 P.2d 916 (1984) (quoting In re Welfare of Todd, 68 Wn.2d 587, 591, 414 P.2d 605 (1966)).

[10] RCW 13.34.020.

[11] In re Dependency of K.D.S., 176 Wn.2d 644, 652, 294 P.3d 695 (2013) (citing Aschauer, 93 Wn.2d at 695).

[12] In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003) (alteration in original) (quoting In re Dependency of M.P., 76 Wn. App. 87, 90-91, 882 P.2d 1180 (1994)).

[13] E.L.F., 117 Wn. App. at 245 (citing In re Welfare of Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973)).

[14] Aschauer, 93 Wn.2d at 695.

RCW 13.34.180(1)(d) requires that the Department prove "the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." The Department must show that it offered Cerio all of these services and that it tailored the services to her needs.[15] But a parent's unwillingness or inability to use the services provided excuses the State from offering extra services that might have been helpful.[16]

Cerio asserts that the Department did not offer all necessary or reasonable services because it did not offer or provide "a psychiatric or medical evaluation to determine whether medication was available" to treat her mental illness or offer nutrition and hygiene education classes. She contends the services that were offered or provided to her by the Department were "late."

The record shows that Cerio never argued below that a psychiatric or medical evaluation was a necessary and reasonably available service. Therefore, she waived this argument.[17]

---

[15] In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001) (citing In re Dependency of P.D., 58 Wn. App. 18, 29, 792 P.2d 159 (1990)).

[16] T.R., 108 Wn. App. at 163 (citing In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988)).

[17] A party may claim an error for the first time on appeal if it concerns "(1) lack of trial court jurisdiction, (2) failure to establish facts upon which relief can be granted, [or] (3) manifest error affecting a constitutional right." RAP 2.5(a). While Cerio argues that this court should review this issue under RAP 1.2(c) ("in order to serve the ends of justice"), she does not argue that any of the exceptions of RAP 2.5(a) applies.

Also, substantial evidence supports the trial court's finding that the Department met the requirements of RCW 13.34.180(1)(d). Lisa Kendall, a Department social worker, testified that as its standard practice, the Department begins with psychological treatment and progresses to more specialized services once a patient demonstrates amenability to testing. Consistent with this practice, the Department addressed Cerio's mental health issues by referring her for psychological evaluations. In September 2011, Dr. LaDue diagnosed Cerio with borderline mental retardation. She recommended services to benefit Cerio, which became court ordered, including mental health counseling, parent coaching, and anger management assessment and treatment.

Although Cerio began these services with several different providers, she repeatedly discontinued them when she disagreed with the provider and often accused the provider of "lying in her case file" and providing false information about her to the Department. Cerio never successfully completed any of these services.

On April 15, 2013, the trial court ordered Cerio to participate in an updated psychological evaluation. The Department referred her to Kevin Zvilna, PhD. After evaluating Cerio, Dr. Zvilna noted that Cerio has difficulty addressing her deficiencies because she "blam[es] providers instead of taking responsibility for her personal troubles." He stated in his evaluation that she ""appeared to be a literalist in requirements when it suited her needs." Dr. Zvilna testified at trial that

he "did not recommend further [treatment] because she hadn't followed through after several iterations."

While the Department never explicitly offered nutrition or hygiene courses, it offered in-home services, where these topics may have been covered. Cerio refused these services several times. Moreover, the record reflects that the Department sent many letters to Cerio telling her about the court-ordered services and referrals. Cerio refused most services, only attending a parenting class orientation, psychological evaluations, and some mental health counseling and parent coaching sessions. Dr. Ted Mausshardt testified that Cerio attended two of seven mental health counseling sessions, explaining her absences by stating that her car broke down, she slept in, had to work, or that claustrophobia prevented her from using the elevator. Mausshardt offered to assist her up the stairs as an accommodation, but Cerio testified, "[I]t doesn't work that way." Cerio never made an appointment with Julie Larson, the last mental health provider the Department referred her to.

Cerio's allegation that the services offered by the Department were "late" is without merit. The tardiness referenced in Cerio's brief dates back to the July 2012 termination order, which the court dismissed without prejudice after finding that the Department "delayed" Cerio's initial psychological evaluation. The trial court, however, found the Department compliant with its court-ordered obligations throughout the dependency review hearings preceding the termination order at issue here.

Cerio argues that "[h]ad the Department promptly provided [Cerio] with this service . . . , she could have—for over two years—had access to a very effective component of anxiety treatment." But she does not show how providing a psychiatric evaluation or hygiene or nutrition education would remedy her parental deficiencies when she consistently failed to engage in services the Department did offer. The Department does not have an infinite duty but rather one limited by considerations of reasonableness, necessity, and foreseeability.[18] Cerio's history of noncompliance, together with her behavior throughout the duration of the dependency proceedings, made it reasonable and foreseeable for the Department to conclude that Cerio would not accept further services had they been offered. Substantial evidence supports the trial court's finding that the Department provided all necessary and reasonably available services.

Even if we were to assume that the Department "'inexcusably fail[ed]'" to offer or provide all necessary services, this would not change the outcome of this case when further effort would be futile.[19] Futility results when the court has found that a parent has not remedied his or her deficiencies within 12 months of entering the disposition and the parent fails to rebut the presumption in RCW 13.34.180(1)(e) "that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future."[20] The focus of

---

[18] See RCW 13.34.180(1)(d).
[19] In re Welfare of M.R.H., 145 Wn. App. 10, 25, 188 P.3d 510 (2008) (quoting T.R., 108 Wn. App. at 164).
[20] See RCW 13.34.180(e).

RCW 13.34.180(e) "is whether the identified deficiencies have been corrected."[21] If the deficiencies have not been corrected, termination of parental rights is still appropriate if the services would not have remedied the parent's deficiencies in the foreseeable future.[22] Although the law provides no numerical standard to measure the foreseeable future, this determination is a factual inquiry evaluated from "the child's point of view,"[23] which varies with the child's age.[24] For young children, the foreseeable future may mean a matter of months.[25] "Although 1 year may not be a long time for an adult decision maker, for a young child it may seem like forever."[26]

A court may consider a parent's mental illness when deciding the potential for remedying parental deficiencies and if termination is appropriate, though it is not prima facie evidence of parental fitness or lack thereof.[27] The court must be

---

[21] M.R.H., 145 Wn. App. at 27 (citing In re Dependency of K.R., 128 Wn.2d 129, 144, 904 P.2d 1132 (1995)).

[22] T.R., 108 Wn. App. at 164; see also RCW 13.34.180(1)(e).

[23] In re Dependency of A.C., 123 Wn. App. 244, 249, 98 P.3d 89 (2004) (citing In re Welfare of Hall, 99 Wn.2d 842, 851, 664 P.2d 1245 (1983); T.R., 108 Wn. App. at 164-66).

[24] T.R., 108 Wn. App. at 164.

[25] See, e.g., Hall, 99 Wn.2d at 850-51 (finding eight months not in foreseeable future of 4-year-old); P.D., 58 Wn. App. at 27 (finding six months not in foreseeable future of 15-month-old).

[26] In re A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988).

[27] "[C]hildren may not be removed from their homes merely because their parents are mentally ill." In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005) (citing In re Welfare of H.S., 94 Wn. App. 511, 528, 973 P.2d 474 (1999)).

careful to ensure that the termination rests on "current unfitness"[28] after examining "the relationship between the mental condition and parenting ability."[29]

The Department provided substantial evidence at trial that Cerio's current mental state signals little likelihood that conditions will be remedied so that G.C. can return to Cerio in the near future. Cerio repeatedly "denies that she has any parental deficiencies," testifying at trial, "I feel I'm a perfectly functioning parent." Cerio also exhibits an extreme distrust of those offering assistance, assigns blame to others, and "has made unfounded accusations with bizarre elements, like selling her child and accusing providers of fraud because she did not agree with their results or requests for information." The trial court found, "Ms. Cerio's mental health issues make her incapable of parenting [G.C.]."

Dr. Zvilna testified that if Cerio were willing to acknowledge her issues and motivated to change, it would take a minimum of six months to correct her deficiencies. Norman Nelson, one of her mental health counselors, offered a longer estimate at trial of two to three years. Given Cerio's statements at trial and her history of 16 referrals to the Department with little compliance or improvement, substantial evidence supports the trial court's finding that there is little likelihood that Cerio will remedy her parental deficiencies in the near future.

The trial court properly found that the continued legal relationship between Cerio and G.C. clearly impedes this child's prospects for adoption into a stable

---

[28] T.L.G., 126 Wn. App. at 203 (citing H.S., 94 Wn. App. at 528).
[29] T.L.G., 126 Wn. App. at 203.

and permanent home and there was little likelihood that conditions will be remedied so that G.C. can return to Cerio's care. It further found that G.C. needs permanence now. Substantial evidence supports these findings. The main focus of RCW 13.34.180(f) "is the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home."[30] Termination can occur absent a showing by the Department that a stable and permanent home is available at the time of termination.[31]

Although Cerio denied being a trigger for G.C.'s PTSD, G.C. routinely exhibited unhealthy, negative behaviors after visits with her. The trial court suspended visits between Cerio and G.C. on July 11, 2012,[32] after "[t]he child's mental health experts report[ed] contact with mother is harmful to the child's mental and psychological health at this time." G.C.'s therapist, Lisa Lopez, expressed concern that G.C.'s progress through treatment was hindered by his contact with Cerio. Dr. Zvilna noted in his psychological evaluation that although Cerio "genuinely seemed to care about and wanted to help her son," she modeled poor behavior to G.C. Zvilna ultimately recommended termination of Cerio's parental rights.

---

[30] In re Dependency of K.S.C., 137 Wn.2d 918, 927, 976 P.2d 113 (1999).

[31] K.S.C., 137 Wn.2d at 927.

[32] In a September 5, 2013, review hearing, visits remained suspended, but the court permitted one supervised visit in order to evaluate whether future visits would be beneficial.

The Department also offered substantial evidence at trial that Cerio would be an inappropriate caregiver because she lacks insight into G.C.'s special needs. Cerio does not dispute the trial court finding of fact 2.33, which states,

> The evidence established that beyond the food and hygiene issues, which brought the case to light, [G.C.] has a number of other issues as well. He has post-traumatic stress disorder, ADHD, and epilepsy. He was language delayed when he went into care. Ms. Cerio told Dr. Zvilna that her son has no problems and that DSHS makes things up. Ms. Cerio cannot or will not see that [G.C.] has issues which he needs help with.

Cerio's own testimony at trial supports finding of fact 2.33. She testified that she believes that G.C. is being "given multiple diagnoses of things that aren't even happening. You've got counselors saying things just to keep him away from me." Dr. Zvilna reported in his evaluation that Cerio "believed [G.C.'s] PTSD 'went away.'" Substantial evidence supports the trial court's finding that continuation of the parent-child relationship diminishes G.C.'s prospects for early integration into a stable home.

Finally, Cerio argues that the trial court's determination that termination is in G.C.'s best interest was "premature" because the evidence shows that she "was very motivated to parent and can do well when she is working within a service that does not provoke her anxiety." But "the court may not accommodate the parents' rights when to do so would ignore the basic needs of the child."[33] The "dominant consideration" when evaluating the best interests of the child is not an individual's motivation to parent but rather the "moral, intellectual, and

---

[33] H.S., 94 Wn. App. at 530 (citing Aschauer, 93 Wn.2d at 695).

material welfare of the child."[34] "The child's right to basic nurturing includes 'the right to a safe, stable, and permanent home and a speedy resolution of [dependency] proceeding[s].'"[35]

"When a parent has failed to rehabilitate over a lengthy dependency period, a court is fully justified in finding termination to be in a child's best interests rather than leaving the child 'in the limbo of foster care for an indefinite period' while the parent seeks further rehabilitation."[36] Dr. Zvilna testified that the instability that results from lengthy dependency can have lasting "detrimental" effects on children. Although Cerio has shown some improvement in her relationship with G.C. as a result of parent coaching, she has failed to show progress in addressing her parental deficiencies over the duration of the dependency. Moreover, testimony from G.C.'s therapist, Lisa Lopez, revealed that G.C. is doing well in his current placement, has expressed a preference to remain there, and that "he didn't want to go back with his mom." A preponderance of the evidence supports the trial court's finding that termination is in G.C.'s best interests.

---

[34] T.R., 108 Wn. App. at 161.

[35] H.S., 94 Wn. App. at 530 (alterations in original) (quoting RCW 13.34.020) (citing In re Dependency of C.R.B., 62 Wn. App. 608, 615, 814 P.2d 1197 (1991)).

[36] In re Dependency of J.A.F., 168 Wn. App. 653, 670, 278 P.3d 673 (2012) (internal quotation marks omitted) (quoting T.R., 108 Wn. App. at 167).

## CONCLUSION

Because substantial evidence supports the trial court's termination findings, we affirm.

Leach, J.

WE CONCUR:

Cox, J.