# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re Dependency of: | ) | NOS. 71716-2-I |
| | ) | 71717-1-I |
| E.T. and K.T. | ) | 71718-9-I |
| | ) | 71719-7-I |
| Minors. | ) | |
| v. | ) | (Consolidated Cases) |
| | ) | |
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| DEPARTMENT OF SOCIAL AND | ) | |
| HEALTH SERVICES, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENYAGHTA THORNTON and | ) | UNPUBLISHED OPINION |
| TARRELL BARRINGTON, | ) | |
| | ) | FILED: January 20, 2015 |
| Appellants. | ) | |

LAU, J. — Kenyaghta Thornton and Tarrell Barrington appeal the termination of their parental rights to ET and KT. We conclude that the challenged statutory prerequisites to termination were satisfied and affirm.

## PRETRIAL HISTORY

Appellants are the biological parents of two-year-old twins—EMMT, a girl, and KLRT, a boy. The children were born on March 13, 2012. They were premature and

tested positive for cocaine. Their mother, Kenyaghta, tested positive for cocaine and marijuana.

The Department of Social and Health Services (Department) immediately removed the children from Kenyaghta's care. Because the father's identity was not yet known, the Department placed the children with their maternal grandmother and step-grandfather. When Kenyaghta left the hospital, she immediately entered and completed a 26-day inpatient drug treatment program.

On May 2, 2012, the Department and Kenyaghta entered an agreed order of dependency. The order required Kenyaghta to undergo chemical dependency, mental health, and parenting evaluations and to follow any treatment recommendations. It also required twice-weekly urinalysis testing and provided two supervised visits with the children per week.

The agreed order stated that Kenyaghta had identified two possible fathers, Tarrell Barrington and AH. She alleged that AH had perpetrated domestic violence against her for 13 years. The order also listed extensive criminal histories for Kenyaghta, Tarrell, and AH. Kenyaghta's prior convictions included assaults, reckless endangerment, possession of drugs, unlawful possession of firearms, and numerous driving offenses. Tarrell's convictions included assaults, drug possession, resisting arrest, reckless endangerment, intimidating a judge, and numerous driving offenses.

Over the next two months, Kenyaghta completed mental health and chemical dependency evaluations. The mental health evaluator, Elizabeth Stover, diagnosed Kenyaghta with major depressive disorder, posttraumatic stress disorder, and polysubstance dependence. Stover recommended individual and group therapy.

Kenyaghta, however, missed the first four appointments and never returned. Stover's discharge summary noted, "Current relationship [with AH] has DV characteristics." Ex. 32.

On August 22, 2012, the court entered a default order of dependency as to Tarrell. The order provided that Tarrell could become a placement for the children if he immediately contacted the Department, established paternity, cooperated in a home study and parenting assessment, took steps to develop a relationship with the children, and engaged in random urinalysis testing.

On February 27, 2013, the Department filed a petition to terminate both parents' parental rights.

In April 2013, Tarrell contacted Department caseworker Patricia Gordon, who arranged for a paternity test.

On May 23, 2013, the court entered a default order of termination as to Tarrell. Several days later, the Department learned that Tarrell's paternity test was positive.

On July 18, 2013, the parties entered agreed orders vacating the default termination and continuing the termination trial that had been set for July 8, 2013, for 90 days. The express purpose of the continuance was to provide services to Tarrell, who agreed to undergo a parenting assessment, follow all recommendations of the provider, and submit to twice-weekly urinalysis testing for 30 days. He further agreed, "An unexcused missed [urinalysis] appointment . . . will be deemed a positive [test] result." Ex. 11.

On July 24, 2013, caseworker Gordon referred Tarrell by letter to Dr. Washington-Harvey for a four-session parenting assessment. The letter indicated that

Gordon had repeatedly but unsuccessfully tried to contact Tarrell at a telephone number he provided two weeks earlier. Messages she left at that number went unanswered.

On July 31, 2013, Gordon met with Tarrell to discuss his services, referrals, and visitation. She gave him a letter regarding twice-weekly urinalysis testing and sent him a follow-up letter one week later describing the required services and providers. The follow-up letter reiterated that an "unexcused missed appointment . . . shall be deemed a positive result." Ex. 35. The services and referrals in the follow-up letter included urinalysis testing, a parenting evaluation, a drug and alcohol evaluation, and parenting education. Ex. 35. The letter mentioned that Tarrell admitted in his meeting with Gordon that he had used cocaine within the last two months.

On September 11, 2013, Tarrell participated in drug/alcohol evaluation with Maria Cole at Recovery Centers of King County. The termination trial began in October 2013. At the time of trial, Kenyaghta was 33 years old and Tarrell was 40.

<u>TRIAL TESTIMONY</u>

The evidence at trial established that both parents had extensive criminal histories, long-standing issues with drugs and/or alcohol, and additional children who were not in their custody.

Kenyaghta has three children—TP, KH, and MM—who are older than the twins. TP's grandmother raised him under a nonparental custody order. KH and MM are in their father's custody due to Kenyaghta's convictions for domestic violence against KH and the father.

Kenyaghta testified that she has been in inpatient treatment for drugs on three occasions, including the treatment program she entered after the birth of the twins. Her

-4-

primary counselor in that treatment program, Rebecca Armstrong, testified that Kenyaghta "did really well" in treatment, "participated fully," and was "[v]ery motivated." 2 Report of Proceedings (RP) (Oct. 9, 2013) at 90-91. Kenyaghta told Armstrong she had used cocaine daily, "for long, long periods of time." 2 RP (Oct. 9, 2013) at 84. Kenyaghta conceded that she never completed outpatient treatment after leaving that program.

Kenyaghta's chemical dependency evaluator, Richard Irwin, concluded that she met the criteria for cocaine and marijuana dependence. He recommended intensive outpatient therapy, including group therapy three times a week and individual therapy twice a month. Kenyaghta missed all but one of these sessions and admitted that she "gave up on it." 2 RP (Oct. 9, 2013) at 50. Kenyaghta submitted to only one urinalysis testing during the entire dependency.

Kenyaghta testified she had last used drugs three months before trial and alcohol two weeks ago. She believed things were heading in a better direction now that she had removed herself from a domestic violence situation that caused her to relapse.

Tarrell testified that he has two children older than the twins. His daughter, TB, was 20 years old at the time of trial and had lived with Tarrell and his mother only for a few months during her teens. Tarrell's son, TB Jr., tested positive for cocaine and marijuana at birth. The findings in TB Jr.'s dependency stated that Tarrell had a "serious and significant problem with alcohol." Tarrell failed to engage in the services offered during TB Jr.'s dependency, and his parental rights were terminated. The Department placed TB Jr. in foster care.

Tarrell testified that his relationship with Kenyaghta ended when he learned she was seeing someone else. She later called him from jail and told him she was pregnant. He initially testified that "she wasn't sure who the dad was" but then said she might have just told him she was pregnant "and left it at that." 7 RP (Oct. 23, 2013) at 72. He next saw her in the hospital when the twins were born. Kenyaghta told him that the twins' paternity "was between [him] and somebody else" or him and "some other people, or whatever." 7 RP (Oct. 23, 2013) at 65. He took no action at that time because the idea of being one of several potential fathers "didn't sit well with [him] and it still doesn't . . . ." 2 RP (Oct. 9, 2013) at 153. When he learned that Kenyaghta had been in treatment after giving birth, he went to the facility to see her, but she had been discharged. He denied knowing whether the twins were in Kenyaghta's care after they left the hospital, but he knew they were living with their grandmother. Tarrell next spoke with Kenyaghta in the spring of 2013. She told him to call Patricia Gordon and "to get our kids." 7 RP (Oct. 23, 2013) at 75.

Tarrell testified that he had used cocaine, alcohol, and PCP (phencyclidine). He claimed he last used cocaine in late April 2013. He admitted using cocaine on several other occasions after undergoing voluntary inpatient treatment in 2010. His drug/alcohol evaluator, Maria Cole, testified that he told her he last used cocaine in June 2013, following the positive paternity test. Tarrell also told her his primary drug of choice was PCP, but he had not used it since 1999. His secondary choice was cocaine, followed by alcohol and heroin. He last used heroin in 2010. He also told Cole he suffered from anxiety and depression and needed mental health treatment. Tarrell admitted telling Cole he needed mental health treatment but claimed he was joking.

-6-

Cole testified that she diagnosed Tarrell with PCP dependence, cocaine dependence, alcohol dependence, and opioid dependence. She recommended intensive outpatient treatment for chemical dependency and a mental health evaluation. Tarrell disagreed with Cole's recommendations and wanted her recommendations reviewed by a supervisor. Cole's supervisor concurred with her recommendation. Tarrell said he would call and make an appointment to begin outpatient treatment, but he never made the call.

Tarrell's oldest child, TB; his brother, Ramon Mayo; his cousin, Mariana Roman; and his employer, James Warlow, all testified to Tarrell's good parenting skills. They testified to his frequent and positive interactions with his two older children and his grandchildren.

Patricia Gordon testified that she received the twins' case from Child Protective Services in the spring of 2012. She attempted to locate Tarrell early in the dependency. She left contact information with the custodial grandparents and asked them to give it to Tarrell when they next saw him. In May 2012, she found an address for Tarrell in the Department's databases and sent him a letter asking him to contact her. Gordon testified that the letter was not returned as nondeliverable. Tarrell testified that he did not recognize the letter and was not sure whether he ever lived at the address on the letter.

Gordon testified that she first heard from Tarrell in April 2013, just after the twins' first birthday. She set up a paternity test, which came back positive in late May 2013. Gordon conceded that the Department did not offer services to Tarrell between the test result in May and the entry of court orders in July that vacated the default termination.

She testified, however, that she did attempt to meet with Tarrell between May and July. He said he could not meet during work hours because of his job. She then offered to meet outside of work hours, but Tarrell did not respond to her offer and did not meet with her until July 31, 2013. At that meeting, Tarrell told Gordon he had used cocaine three months earlier.

Gordon said Tarrell attended the first of four parenting assessment sessions in mid-August, but then missed the next two. The termination proceedings commenced before the next scheduled session. Tarrell did not follow up with outpatient drug and alcohol treatment or the recommended mental health evaluation. He also missed several urinalysis tests, which were deemed to be positive results under the court's orders. While the tests he did take were negative for drugs, two or three were positive for alcohol. Tarrell made no supervised visits with the children until the termination trial was underway. Similarly, Kenyaghta completed only one urinalysis test prior to trial. She also failed to complete mental health treatment and outpatient treatment for her substance abuse. She attended no parenting evaluation sessions in 2012 and only two in 2013, both shortly before trial. Despite the availability of twice-weekly visits and seven referrals to facilitate those visits, Kenyaghta only visited the children once during the dependency.

Gordon recommended termination of both parents' parental rights. She testified that they received the referrals necessary to complete all court-ordered services but neither successfully completed those services and neither had "a current relationship with the children." 5 RP (Oct. 21, 2013) at 166. Kenyaghta had not "engaged in her services in any meaningful way to diminish her parental deficiencies related to her

-8-

behaviors of drug and alcohol, criminal behavior, mental health." 5 RP (Oct. 21, 2013) at 165. Tarrell's long-standing substance abuse, missed urinalysis tests, and positive tests for alcohol were also significant issues. Given Tarrell's relatively recent inpatient treatment for cocaine, Gordon was very concerned by his recent cocaine use and admission that he had used on other occasions since his treatment.

Gordon concluded that the parents had made insufficient progress in correcting their parental deficiencies and that they would be unable to do so in the near future. The children could not wait for Tarrell to complete the six months to one year of outpatient treatment recommended by the evaluator. Nor could they wait for Kenyaghta to initiate and complete all of her service requirements.

Elizabeth Berris, the children's guardian ad litem, testified that the parents had received all necessary services and that there were no other available services that should have been offered. She believed termination was in the children's best interests. She had "very high concerns" about Kenyaghta's long-standing, untreated substance abuse and her failure to follow through with outpatient treatment and urinalysis testing. She also noted Kenyaghta's "untreated mental health" issues, her failure to prioritize the children, her inability to care for her other three children, and her lack of a plan to address her deficiencies other than "'I want my kids back.'" 6 RP (Oct. 22, 2013) at 148.

Berris had similar concerns about Tarrell. Given the prior dependency finding that he had "a serious and significant problem with alcohol," Berris found his recent positive tests for alcohol concerning. 7 RP (Oct. 29, 2013) at 6. She was also concerned by his long-standing issues with cocaine and his disagreement with the

results of his 2013 chemical dependency evaluation. She testified that his "minimization of his own drug use and alcohol use is a risk factor for these children." 7 RP (Oct. 23, 2013) at 6. She noted, "If he would have embraced the evaluation and done whatever he could to get his kids back, he could have been in his fifth or sixth week of intensive outpatient" treatment at the time of trial. 7 RP (Oct. 23, 2013) at 6.

Berris was particularly critical of Tarrell's failure to act as soon as he knew he could be the father:

> He allowed his own hurt feelings to come in the way of him developing a relationship with these children.
> He testified that he was one of four possible fathers. The mother testified that he was one of two possible fathers. The department's petition and the department testified he was one of two possible fathers.
> His brother testified that he knew she was pregnant, he knew he could be one of them. He acknowledged he knew he had intercourse with the mother, that he knew he could have been one of the fathers, and he put his own feelings above the relationship with his children.
> He could have stepped up to the plate; he could have requested a genetic paternity test to establish that he was the biological father.
> And then looking at the time period when the mother notified him of the legal case . . . in the end of March or April of 2013 . . . .
> . . . He is making efforts to change his life, but what he has done since that April [2013] phone call . . . hasn't been with speed or diligence, and these children are at this point 19 months.
> He didn't attend his drug/alcohol evaluation until September, mid-September. He missed at least two [sessions] with Dr. Washington-Harvey for his parenting assessment.
> Testimony of Misty Brae and the evidence from the visitation center . . . that he was not available for visitation -- concerns me.
> If dad really was stepping up to the plate to be a resource for his kids that he didn't believe were his but now he does, he would be making himself available for those visits.
> . . . .
> There is a biological relationship but there is not an emotional relationship from the children to him. They don't know who he is.

7 RP (Oct. 23, 2013) at 9–11. Berris also pointed out that neither Kenyaghta nor Tarrell had suitable housing for the children.

-10-

Berris rejected the possibility of long-term foster care or a continued placement with relatives, stating:

> Children need permanency. These children have been waiting for their parents to parent them for 19 months – their entire lives. They don't know their parents.
> Keeping a dependency open . . . is placing the parents' rights over the children's rights to permanency and the statute is very clear that children have a right to a permanent plan and a speedy resolution to proceedings under [chapter] 13.34 [RCW].

7 RP (Oct. 23, 2013) at 16.

Misty Braae, a visitation coordinator, testified that to her knowledge, no supervised visits ever occurred between the parents and the children.

Dr. Carmela Washington-Harvey, a licensed psychotherapist, conducted parenting evaluations of Kenyaghta and Tarrell. Because the parents had not completed their evaluation sessions when trial concluded on October 29, 2013, the court deferred ruling on the termination petition until Dr. Washington-Harvey completed the evaluations.

When trial resumed in January 2014, Dr. Washington-Harvey submitted her final evaluations and testified regarding her conclusions. Her written evaluation of Kenyaghta states that she reported "being arrested more than ten times on drug related charges, attempted forgery and assault" and that she has spent a total of six months in jail. She first smoked marijuana at age 7 and tried alcohol at age 12. She first used cocaine, crack cocaine, and barbiturates at age nineteen. She currently smokes marijuana at least three times per week and only recently stopped using cocaine and crack cocaine. She admits she is a drug addict and says she has been in residential treatment a total of three times. Her longest period of sobriety has been six months.

The evaluation states that Kenyaghta's prognosis for safely and appropriately parenting her children is "guarded to poor." Ex. 114, at 8. Testing indicated that Kenyaghta has "a serious lack of awareness regarding child development," "problems with interpersonal relations, poor internal local of control, lack of family connections, poor self concept and lack of trust." Ex. 114. The evaluation lists the following reasons for Kenyaghta's prognosis:

> 1) She continues to use drugs even after completing drug treatment. 2) She has not been able to parent her own children for any substantial period of time. 3) She seems to lack a general awareness of what is needed to parent her children. 4) She admits to making poor choices in life partners and wasn't able to identify a support system within her family or otherwise that might assist in the parenting of her children.

Ex. 114, at 8.

Kenyaghta's evaluation further states that reunification cannot be considered until she successfully completes services. Dr. Washington-Harvey testified that Kenyaghta would need to be sober "for at least a year" before she could be considered fit to parent. When asked if it was important for Kenyaghta to access services related to her domestic violence issues, Dr. Washington-Harvey said that domestic violence treatment should be "part of her therapy." 8 RP (Jan. 28, 2014) at 69.

Dr. Washington-Harvey's written evaluation of Tarrell states that he reported being "arrested more than one hundred and twenty times." He acknowledged numerous prior convictions and reported that he first used alcohol at age 15, marijuana at age 17, hallucinogens and PCP at age 19, cocaine at age 21, and crack cocaine at age 26. He claimed he only drinks on social occasions and last used cocaine at age 40. His longest period of sobriety has been 18 months.

-12-

Tarrell's evaluation states that his parenting prognosis is also "guarded to poor given his inability to remain clean and sober and inconsistency in visiting his children." Ex. 113, at 7. In addition, "his commitment to change is in question, and his lack of steady employment and housing also factor into [his] ability to properly provide for his children." Ex. 113, at 7. Tarrell's responses to test questions invalidated all but one of the tests. This indicated that he either lacks insight or was deliberately evasive for fear of being presented in an unfavorable light.

Dr. Washington-Harvey concluded that Tarrell's recent drug use and inconsistent visitation "demonstrates a lack of commitment to being a parent and . . . demonstrates a serious need for him to participate in drug treatment and possibly mental health treatment." Ex. 113, at 7. Significantly, she concluded Tarrell could not be reunified with the twins until he is sober for at least one year, engaged in consistent visitation, and participating in drug and mental health treatment.

The trial court ruled that the Department had met its burden under RCW 13.34.180(1) and .190(I)(a) and (b) and terminated Kenyaghta's and Tarrell's parental rights. They appeal.

## DECISION

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate parental rights, the State must satisfy a two-step test. First, it must prove the following statutory elements by clear, cogent, and convincing evidence:[1]

---

[1] "'Clear, cogent and convincing' means highly probable." In re Welfare of M.R.H., 145 Wn. App. 10, 24, 188 P.3d 510 (2008).

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . . and
> (f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). If the trial court finds that the State has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interests" of the child. RCW 13.34.190(2).

On review, unchallenged findings of fact are considered verities. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing, an appellate court should not disturb the trial court's findings." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

Mother's Appeal. Kenyaghta's sole contention on appeal is that the State failed to carry its burden of proving, by clear, cogent, and convincing evidence, that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). She argues that she needed "domestic

-14-

violence victim's services" and that the State's failure to offer such services requires reversal.

The State responds, and Kenyaghta does not dispute, that she could have received domestic violence treatment had she engaged in the mental health services offered by the Department. Elizabeth Stover testified that domestic violence issues "would have been addressed" in therapy sessions Kenyaghta failed to attend. 2 RP (Oct. 9, 2013) at 73. Dr. Washington-Harvey essentially corroborated Stover's testimony, saying that domestic violence issues should be addressed in "therapy."

Alternatively, the State argues, and Kenyaghta again does not dispute, that Kenyaghta's "unwillingness or inability to make use of the services provided excuses the Department from offering extra service that might have been helpful." Resp't's Br. at 30. We agree. Even when the Department "inexcusably fails" to offer a necessary service, termination is still appropriate if the additional service would not have remedied the parent's deficiencies in the foreseeable future. In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001); In re Welfare of Hall, 99 Wn.2d 842, 851, 664 P.2d 1245 (1983). Thus, if the record establishes that offering a service would have been futile, the trial court can make a finding that the State offered all reasonable services. In re Welfare of M.R.H., 145 Wn. App. 10, 25, 188 P.3d 510 (2008).

The record in this case amply demonstrates that a separate referral for domestic violence treatment would not have remedied Kenyaghta's parental deficiencies in the foreseeable future and would have been futile. She had twice been offered domestic violence treatment in other relatively recent court proceedings. She did not participate in one program and if she participated in the other, she does not appear to have

-15-

benefited from it. Accordingly, Kenyaghta's challenge to the court's finding under RCW 13.34.180(1)(d) fails.

Kenyaghta also assigns error to a number of the court's findings but does not devote any argument to the findings in her brief. The assignments of error are therefore waived. In re Dependency of P.H.V.S., __ Wn. App. __ , 339 P.3d 225, 233 n.9 (2014) ("Where a party assigns error to a finding but presents no argument in their opening brief on any claimed assignment, that assignment of error is waived.").

Father's Appeal. Tarrell contends the State failed to prove there was little likelihood that his parental deficiencies could be corrected in the near future. We disagree.

Tarrell argues that, contrary to the court's findings, he demonstrated sobriety with his urinalysis tests and therefore could safely parent his children in the near future. But while his urinalysis tests were negative for drugs, some were positive for alcohol. And as discussed above, his missed urinalysis testing appointments were deemed to be positive tests for drugs and alcohol under the terms of the court's order. There was also evidence that despite Tarrell's prior inpatient treatment for cocaine dependence, he had used cocaine as recently as June 2013—only a few months before trial—and on other occasions since his treatment.

The record also belies Tarrell's claim that he could remedy his parental deficiencies in the "near future." He concedes that the near future for young children may be a matter of months. Indeed, Dr. Washington-Harvey, caseworker Patricia Gordon, and the guardian ad litem testified that given the children's ages and the length of the dependency, the "near future" had essentially arrived and the children could not

wait for any significant period to be placed in a stable and permanent home. The court found, "The near future for these two year old children is now. Dr. Washington-Harvey opined that each parent would need at least a year to correct parental deficiencies. . . . These children cannot wait another year for permanency and stability." Finding of Fact 2.9(i). This finding is supported by clear, cogent, and convincing evidence and relevant case law. See In re Dependency of T.R., 108 Wn. App. at 165–66 (one year not "foreseeable" or "near" future for six-year-old child); In re Welfare of Hall, 99 Wn.2d at 851 (eight months is not within the foreseeable future of a four-year-old child); In re Dependency of A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988) (one year not in the near future of three-year-old child); In re Dependency o P.A.D, 58 Wn. App, 18, 27, 792 P.2d 159 (1990) (six months not in near future of 15-month old child).

Tarrell also contends the Department failed to timely provide services. Specifically, he contends there was "a departmental delay of three months in offering services from the date [Tarrell] came forward, and a delay of over two months from the date [of] the DNA results . . . ." Appellant's Br. at 27. He contends this delay hampered his ability to correct his parental deficiencies before trial and undermines the finding that he failed to act "diligently or with speed [after] he learned he was likely the father of the children." Finding of Fact 2.11. Because the services were untimely, he reasons that the State did not satisfy the service requirements of RCW 13.34.180(1)(d). (requiring the State to show that "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided."). Again, we disagree.

A review of the record shows that it was Tarrell, not the Department, who failed to act diligently. Tarrell knew early in the dependency that he was one of several possible fathers of the twins. Instead of coming forward to determine whether the children were his, he did nothing and left parenting of the children to others. Had he come forward in the first months after the twins were born, he could have received a paternity test and services a full year earlier than he did. And contrary to Tarrell's assertions, the Department attempted to find him in 2012 but to no avail.

The record also supports the court's finding that it was Tarrell, not the Department, who failed to act with diligence and speed once he came forward. The Department agreed to continue the termination trial so that Tarrell could have an opportunity to engage in services. But as Patricia Gordon testified, attempts to set up an initial services appointment with Tarrell were unsuccessful. When referrals were eventually made in July 2013, Tarrell either did not engage in the services or engaged sporadically. He completed a substance abuse evaluation that recommended intensive outpatient treatment and a mental health assessment, but he did not follow through with either recommendation. Although he completed a number or urinalysis tests, he missed several tests and had several positive tests for alcohol. Although he received a referral for four parenting assessment sessions with Dr. Washington-Harvey, he missed several sessions and did not reschedule his second session until the first day of trial. The record supports the court's finding that Tarrell was offered all necessary services capable of correcting his parental deficiencies. The Department is not responsible for his failure to timely take advantage of them.

Tarrell challenges several of the court's findings of fact in footnotes in his opening brief. We need not address arguments raised in footnotes. <u>State v. Johnson</u>, 69 Wn. App. 189, 194 n.4, 847 P.2d 960 (1993). In any event, we have reviewed the record and conclude that the challenged findings either are supported by the record or were not material to the court's decision.

Affirmed.

_____

WE CONCUR:

_____          _____