# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| IN RE DEPENDENCY OF D.P., DOB: 09/02/2014, | ) ) ) | No. 73918-2-I |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL & HEALTH SERVICES, | ) ) ) ) | |
| Respondents, | ) ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| SAMIRA MALJANOVICH, | ) ) | |
| Appellant. | ) | FILED: <u>October 24, 2016</u> |

SPEARMAN, J. — Samira Maljanovich is the mother of P.D., who was born on September 2, 2014.[1] P.D. was hospitalized at six months old with bleeding in her brain, seizures, and failure to thrive. She was removed from her parents' care. The State filed a dependency petition, which both parents contested. The matter was tried over eight days in July 2015 and concluded with the trial court entering an order of dependency. The mother appeals this order claiming a lack of substantial evidence that P.D. was abused, neglected, and had no adequate parent. Finding no error, we affirm.

---

[1] Although the caption refers to the child in this proceeding as D.P., in their briefs the parties correctly use the initials P.D. We do likewise in the body of this opinion.

## FACTS

As a newborn, P.D.'s parents cared for her together. Their relationship was volatile. Both parents alleged domestic abuse, and the father was alcohol dependent. In November 2014, the mother moved out of the family home and the parents agreed to equally divide P.D.'s care. During this time, P.D. was observed as a normal but fussy baby.

On December 24, 2014, the father took P.D. into his sole care. Police made a welfare check shortly after and observed that P.D. was "doing O.K." Verbatim Report of Proceedings (VRP) at 198, 509. On January 9, 2015, the mother served the father with a domestic violence protection order and took P.D. into her sole custody. The mother immediately brought P.D. to the emergency room. P.D. had a cough and diaper rash but appeared well and normal.

The mother had P.D. in her sole care and custody after January 9, 2015. The father had no contact with the baby. From November 2014 to early February 2015, P.D. attended a daycare where she appeared to be healthy and no injuries were reported. Similarly, there were no injury reports while P.D. was in the daycare at her mother's gym in February 2015.

On February 27, 2015, the mother took P.D. to the emergency room at Auburn Medical Center. P.D. was treated for a urinary tract infection, fever, and vomiting. She was prescribed medications and discharged to her mother, who was instructed to bring P.D. to her primary care provider the next day due to potential kidney infection. The mother did not do so.

P.D. did not improve. She was increasingly lethargic and unresponsive, and stopped moving her right eye. On March 4, 2015, the mother brought her to the emergency department at Mary Bridge Hospital. A computerized tomography (CT) scan revealed that P.D. had chronic and acute subdural hematomas (bleeding in the brain). P.D. started seizing and was transferred to intensive care. She was examined and treated by a multi-specialty team of physicians. After ruling out diagnoses such as a bleeding disorder, the team concluded that P.D.'s condition was caused by nonaccidental head trauma. Her diagnoses included: kidney infection, dehydration, failure to thrive, anemia, seizure, intracranial hemorrhage, subdural hemorrhage, and retinal hemorrhage.

P.D. also appeared malnourished. While always a small baby who had difficulty feeding, her pace of weight gain dropped while she was in her mother's sole care. The amount that P.D. ate was variable, but at times she consumed as little as a third of the calories that she needed.

The hospital contacted the Department of Social and Health Services and law enforcement, which both opened investigations. The State filed a dependency petition and P.D. was discharged from the hospital to licensed foster care. At the time of trial, P.D. was nine months old. Her gross and fine motor skills were significantly delayed, but her health had improved and she had gained a significant amount of weight.

At trial, the mother did not dispute that P.D.'s medical condition included subdural hemorrhages, retinal hemorrhages, and seizures. The primary points of

contention were whether the hemorrhages were the result of nonaccidental trauma and, if so, who or what caused it.

The State presented the expert medical testimony of physicians who treated or evaluated P.D.'s hemorrhagic injuries during her hospitalization at Mary Bridge. Dr. Robin Rogers, a pediatric hospitalist, examined P.D. when she was initially admitted to Mary Bridge. Dr. Rodgers testified that P.D.'s primary diagnosis was abusive head trauma based on bleeds in the brain, increased pressure in her brain, seizures, rapid clinical deterioration, and negative tests for infections or bleeding problems. She explained that infants who have been abused often feed poorly, have poor growth, and can be lethargic and irritable, so P.D.'s failure to thrive and irritability helps support an abusive head trauma diagnosis. Dr. Rogers testified that in her clinical opinion, abuse was the most likely explanation of P.D.'s condition.

Dr. Thomas Grondin, pediatric neurosurgeon, testified that P.D.'s acute subdural hematomas were a couple of days old and her chronic subdural hematomas were at least three weeks old, but not so old as to be an injury from P.D.'s birth. He also testified that a fairly strong acceleration/deceleration kind of force is necessary to cause a hematoma in the brain, such as a fall from a height of four or five feet. But no one had provided information that P.D. had had such an event and there were no obvious signs of external injury such as bruises. Dr. Grondin concluded that P.D.'s injuries were the result of nonaccidental trauma. He testified that he considered but ruled out other possible causes of the injuries.

A magnetic resonance imaging (MRI) test showed that in addition to the hematomas, P.D. also had restricted diffusion in the white matter of her brain. According to Dr. Yolande Duralde, the medical director of the Child Abuse Intervention Department at Mary Bridge, the most likely cause of this condition was a "shearing force" such as shaking or "some sort of acceleration/deceleration injury" which occurred a few days before P.D. was admitted to the hospital. RP 890, 892. She also testified that she could not discern the specific cause of the injury but that it could be the result of shaking or being thrown up against a wall.

Dr. Clark Deem, an ophthalmologist, examined P.D. and found over 100 retinal hemorrhages in each eye. He testified that "the hemorrhages looked quite bright red and recent" and estimated that they were at most ten days old. VRP (07/09/15) at 469-70. He also concluded that the appearance of the injuries was "classic for infant-shaking." Id. at 469.

Dr. George Makari, a pediatric neurologist, also examined P.D. and reviewed her CT and MRI scans. He testified to a reasonable degree of medical certainty that P.D.'s injuries were caused by nonaccidental trauma. He testified that the injuries could be caused "[e]ither a blunt trauma or a whiplash. And since we don't have evidence of blunt trauma, a whiplash would be more likely." VRP (07/14/15) at 665.

The mother offered expert testimony by Dr. Ronald Uscinski, who disputed the abusive head trauma diagnosis. Dr. Uscinski testified that animal studies show that before shaking can create enough force to cause a subdural

hemorrhage, a child would first suffer a neck injury. And because there was no evidence that P.D. had suffered any injuries to her neck, he opined that shaking was not the source of P.D.'s hemorrhages. He attributed P.D.'s chronic subdural hemorrhaging to birth trauma, and P.D.'s acute subdural hemorrhaging to a re-bleed of the chronic blood from an event as minor as vomiting. The trial court did not find this testimony credible.

The trial court found that P.D.'s injuries and her other health conditions arose while she was in "her mother's exclusive care." Clerk's Papers (CP) at 554. It entered an order finding that P.D. was a dependent child because she was abused and/or neglected and had no parent capable of meeting her needs.[2] The mother appeals.

<u>DISCUSSION</u>

In evaluating a claim of insufficiency of the evidence in a dependency proceeding, this court determines whether substantial evidence supports the trial court's findings of fact and whether those findings of fact support the trial court's conclusions of law. In re Dependency of C.M., 118 Wn. App. 643, 78 P.3d 191 (2003). Evidence is substantial if, viewed in the light most favorable to the prevailing party, a rational trier of fact could find the fact by a preponderance of the evidence. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003). The legislature has determined that in balancing the legal rights of parents against the rights of the child, the rights and safety of the child shall be

---

[2] The court also found P.D. dependent as to the father, but only on the latter ground.

the paramount concern. RCW 13.34.020; In re Dependency of Schermer, 161 Wn.2d 927, 942, 169 P.2d 452 (2007). Thus, when a child's best interests conflict with the parent's interests, the child's interests must prevail. In re Dependency of J.B.S., 123 Wn.2d 1, 8-10, 863 P.2d 1344 (1993). The deference paid to the trial judge's advantage in having the witnesses before him or her is particularly important in this context, and this court does not reweigh the evidence or evaluate witness credibility. In re Aschauer's Welfare, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980); In re E.L.F., 117 Wn. App. at 245 (citing In re Sego, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973)).

The mother argues there is not substantial evidence of abuse or neglect to sustain the finding of dependency. She rests her argument on the testimony of Dr. Uscinski, who disputes that abuse caused P.D.'s injuries. She argues that the trial court erred in finding that P.D. is dependent due to abuse or neglect and due to having no adequate parent. She also contends the court erred in finding that P.D. cannot be placed with her mother due to manifest danger. In support of her argument, the mother assigns error to multiple findings of fact. Finally, the mother argues that even if P.D.'s injuries are nonaccidental, another person must have inflicted them.

Parents have a fundamental liberty interest in the care and welfare of their children, and State interference is never to be taken lightly. In re Schermer, 161 Wn.2d at 941 (citing In re Welfare of Sumey, 94 Wn.2d 757, 762, 621 P.2d 108 (1980)). But the State has an interest in protecting the physical, mental, and emotional health of children. In re Schermer, 161 Wn.2d at 941. A dependency is

a preliminary proceeding that does not permanently deprive a parent of rights. In re Welfare of Key, 119 Wn.2d 600, 609, 836 P.2d 200 (1992) (citing In re A.W., 53 Wn. App. 22, 30, 765 P.2d 207 (1988)). Dependency proceedings are designed to protect children from abuse and neglect, help parents alleviate problems that led to State intervention, and reunite families if appropriate. In re Schermer, 161 Wn.2d at 943; In re Interest of J.F., 109 Wn. App. 718, 728, 37 P.3d 1227 (2001).

To find a child dependent, the State must prove by a preponderance of the evidence that the child meets a statutory definition of dependency. RCW 13.34.110(1). In this case, the trial court found P.D. dependent under both RCW 13.34.030(6)(b) and (c). Subsection (b) provides that a child is dependent where she is abused or neglected, by a person legally responsible for her care. RCW 13.34.030(6)(b). Abuse or neglect is "injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety ... or the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child." RCW 26.44.020(1). Subsection (c) provides that a child is dependent where the child "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." RCW 13.34.030(6)(c).

The mother argues that there is not substantial evidence that she abused P.D. She assigns error to findings of fact 2.2(jj) and (ll), that

> [P.D.] sustained both acute and chronic injuries to her brain while under her mother's exclusive care. The mother either physically abused and/or neglected [P.D.]. [P.D.] had gained less than one pound and a half in the two months after she had been returned home to her mother. The explanations by the mother as to what happened to [P.D.] were not credible.
>
> ....
>
> The state has proved by a preponderance of the evidence that while on the mother's watch, [P.D.] had an acute injury as defined variously by the Mary Bridge team of physicians as being within a week or two old coupled with a chronic injury probably occurring after she was in the mother's care.

CP at 554. At trial, the mother testified that P.D.'s acute hematoma was caused by driving over speed bumps or slamming on the brakes. She argued that the chronic hematoma could have been a birth injury or could have occurred while in the care of another person. The trial court found that these explanations were not credible, a finding which is not reviewed by this court. In re Aschauer, 93 Wn.2d at 695.

The State presented evidence that P.D. was abused while in her mother's care. When P.D. left her father's care on January 9, 2015, she had a normal medical exam. By March 4, 2015, she was lethargic and unresponsive. Her right eye did not track and she began to have seizures in the hospital. She had chronic and acute hematomas indicative of multiple head injuries. Coupled with retinal hematomas and brain swelling, P.D. was diagnosed with abusive head trauma, which is often referred to as "shaken baby syndrome." P.D. was most recently injured within two weeks of her hospitalization. In spite of controversy surrounding shaken baby syndrome, the trial court found persuasive the testimony of the Mary Bridge physicians that P.D. suffered nonaccidental trauma

9

while in her mother's care. We conclude that substantial evidence supports the trial court's finding that P.D. is dependent due to abuse.

The mother assigns error to finding of fact 2.2(ii), that "[t]estimony by Dr. Duralde and other Mary Bridge physicians indicated that this was a result of a shearing force and was a result of a relatively recent nonaccidental force. The court found this testimony to be credible." CP at 554. She also assigns error to finding of fact 2.2(gg), that

> [t]he mother offered expert testimony by Dr. Ronald Uscinski. He disputed the diagnosis of shaken baby syndrome and abusive head trauma. He testified that there have been animal studies conducted which show that before a person can apply enough force for abusive head trauma or head trauma or symptoms that [P.D.] exhibited, a child would have to suffer a neck injury first. The court did not find Dr. Uscinski's testimony credible.

The record shows that these two findings of fact are accurate summaries of the medical expert witness testimony and thus, they are supported by substantial evidence. We do not review the trial court's finding of credibility. In re Aschauer, 93 Wn.2d at 695. The trial court did not err in entering findings 2.2(ii) and (gg).

The mother also challenges the finding of neglect. Negligent treatment or maltreatment is defined as "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety. . . ." RCW 26.44.020(16). A child's failure to gain weight and a parent's failure to follow up with medical care is evidence of neglect. In re E.L.F., 117 Wn. App. at 243.

The State presented evidence that the mother engaged in a pattern of failing to act on P.D.'s medical needs. She did not take P.D. to a primary care provider while in her exclusive care, even though P.D. was due for her four month checkup and she was instructed to do so when P.D. was discharged from the emergency room for a urinary tract infection. In the five days prior to admission at Mary Bridge, the mother noticed that P.D. was lethargic and her right eye was not tracking well. There was an hour-long period where P.D. was unresponsive but breathing. Despite these alarming signs, the mother did not immediately take P.D. to the emergency room. Upon admission to Mary Bridge, P.D. was chronically malnourished and diagnosed with failure to thrive.

P.D.'s slow weight gain is evidence of neglect. Medical records show that P.D. gained one pound, three ounces between January 9, 2015 and March 4, 2015. P.D. appeared malnourished when admitted to the hospital, and the mother reported feeding her far less formula than was required to maintain a healthy weight. P.D.'s failure to thrive appears to be the cumulative effect of the mother's behavior that was a clear danger to P.D.'s health by the time she entered the hospital. The finding of neglect is supported by substantial evidence.

The mother assigns error to several additional findings of fact that do not impact the trial court's dependency order. She assigns error to finding of fact 2.2(a), that "[i]n November 2014, mother moved out of the home and left [P.D.] with the father. . . ." CP at 549. The mother is correct that substantial evidence does not support this finding. When the mother left home in November, she and the father shared care for P.D.

11

The mother also assigns error to finding of fact 2.2(v), that "[t]he mother did not explain how [P.D.] came to have the head injury." CP at 552. The mother cites her explanation that P.D. may have hit her head while the mother was driving over a speed bump or when the mother slammed on her brakes at a four way stop. As discussed above, these explanations are not consistent with the severity of P.D.'s injuries and the trial court did not find them credible.

The mother assigns error to finding of fact 2.2(bb) that "based on his investigation, [Detective Rob Jones] had no reason to believe that [P.D.] suffered any injuries at the daycare." CP at 553. Detective Jones testified about his investigation into whether P.D. suffered injuries at the daycare, which provided substantial evidence to support this finding.

The mother assigns error to finding 2.2(mm), that "[t]he child should remain in out-of-home placement" and finding of fact 2.5 that "[t]he health, safety, and welfare of the child cannot be adequately protected in the home." Substantial evidence of abuse and neglect demonstrates that P.D. cannot be adequately protected at home and should remain in an out-of-home placement.

While the mother also assigns error to the dependency finding made under RCW 13.34.030(6)(c), that P.D. lacks an adequate parent capable of caring for her, her challenge was not supported by argument. "A party abandons assignments of error to findings of fact if it fails to argue them in its brief." Valley View Indus. Park v. City of Redmond, 107 Wn.2d 621, 630, 733 P.2d 182 (1987) (citing Seattle Sch. Dist. v. State, 90 Wn.2d 476, 585 P.2d 71 (1978)). The

mother therefore abandons her challenge to the finding of dependency on this ground, and it is a verity on appeal.

Affirm.

WE CONCUR:

_Spearman, J._

_Appelwick, J._

_Cox, J._