IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

2018 JAN -8 AM 10: 01

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

| | |
|---|---|
| In re Matter of the Dependency of | ) |
| | ) No. 76430-6-I |
| J.K.I., | ) (consolidated with |
| DOB: 08/15/2006, | ) 76431-4-I & 76432-2-I) |
| | ) |
| T.J.I., | ) DIVISION ONE |
| DOB: 07/26/2003, | ) |
| | ) |
| M.J.I., | ) UNPUBLISHED OPINION |
| DOB: 09/12/2012, | ) |
| | ) FILED: January 8, 2018 |
| Minor Children. | ) |

BECKER, J. — A mother seeks reversal of an order terminating her parental

rights as to her three children. She argues that the court should have granted

her an additional six months to engage in services. Ample evidence at trial

showed that her prior participation in services was minimal. Her ability to provide

a stable, nurturing home for her children remained in doubt. We affirm.

FACTS

Appellant is the biological mother of T.J.I. (DOB 7/26/03), J.K.I. (DOB

8/15/06), and M.J.I. (DOB 9/12/12). Finding of Fact (FF) 2.4. The State removed

the children from their parents' custody in July 2014, following an incident where

law enforcement was called to respond to a report of physical domestic violence

between the mother and the children's father. FF 2.7-2.8. The State filed dependency petitions that summer. FF 2.5, 2.9. Dependency as to the father was established on October 1, 2014. FF 2.10. Dependency as to the mother was established on October 8, 2014, after a fact-finding hearing. FF 2.11. The dependency court found, by a preponderance of the evidence, "The mother's parental deficiencies are lack of housing, mental health, substance abuse, engagement in a domestic violence relationship, and an inability to provide for the children's basic needs." FF 2.12. The court ordered the mother to participate in a variety of services, including drug and alcohol evaluation, domestic violence assessment, psychological evaluation with a parenting component, and urinalysis testing. FF 2.14. The mother was later ordered to engage in individual counseling and take a hair follicle test. FF 2.15-2.16.

The mother did not comply with many of these requirements. The State filed termination petitions on March 16, 2016. FF 2.17. The father did not contest termination of his rights. A trial on termination of the mother's rights was held in October 2016. FF 1.1. After several days of testimony—including testimony from both parents, social workers, and other treatment providers—the court issued an oral ruling granting termination on November 2, 2016. Report of Proceedings at 906.

On January 5, 2016, during a hearing on a proposed written order, the mother moved to continue the matter or stay entry of the order for six months. The court denied this request and entered a written order the next day. The

2

order includes over 100 findings about the mother's failure to engage in services and her continued parenting difficulties, including the following:

Mental health:

- "The mother has suffered some terrible events in her life. She lost a baby who was only four days old in 2011 and her stepson . . . died in 2013 while a dependent child under the care of the Department. These events have no doubt had a profound and lasting effect on the mother and she deserves our sympathy and compassion." FF 2.19 (unchallenged).

- "The mother has significant mental health issues that negatively impact her ability to safely parent and that will require long-term treatment. In February 2014, the mother was involuntarily admitted to the hospital due to a mental break. The mother admitted that she needed continual mental health treatment, but she has not followed through." FF 2.108 (challenged).

- "It is abundantly clear that while the mother has completed a psychological evaluation with a parenting component with Dr. Swing, she has failed to complete the recommended counseling without any justification." FF 2.83 (unchallenged).

- "Recently the mother referred herself to counselor Anna Abramyan, MSW, an outreach mental health counselor with Island County Human Services, without any notice or referral from the Department. Ms. Abramyan is not a licensed counselor as of yet." FF 2.81 (unchallenged).

- "The mother and Ms. Abramyan had met three times as of the time of trial and were still in the process of building rapport. This clearly does not constitute compliance with the various court orders requiring individual counseling." FF 2.82 (unchallenged).

Substance abuse:

- "The record shows that the Department made referrals for all of the required services. Despite this fact, the mother has never undertaken a single UA during the course of these proceedings." FF 2.22 (unchallenged).

- "The mother testified that she did a few UAs before the dependency case was filed and shortly thereafter, and further claimed they were negative. These were not UAs done pursuant to Department

referrals, and the mother has never produced the actual results of these UAs. Even if it were true that the mother did do these UAs, that does not excuse her failure to do the court-ordered UAs." FF 2.23 (unchallenged).

- "Substance abuse was properly identified as a significant issue in this case. The father and the mother had been together for about 14 years as of July 2014 when the children were removed from their care. The father testified that he was actively using drugs for several months after [the mother's stepson] died, and that the mother was also involved in using drugs. The father testified that he and the mother used several times a week for several months before the children were removed." FF 2.24 (challenged).

- "The mother denied drug use in her testimony. The Court finds that the mother is not credible in this regard." FF 2.27 (challenged).

- "The Court finds that the mother did in fact use illegal drugs for a significant period of time and was actively using drugs at the time the children were removed from the parents' care in July 2014." FF 2.28 (challenged).

- "There was ample justification for the Court to require random UAs, a drug and alcohol evaluation and compliance with recommended treatment. There was no justification whatsoever for the mother's failure to comply with these services." FF 2.29 (challenged).

- "It is true, as the mother argues, that there is little or no evidence of current drug use by the mother. But given the significant history of drug use by the mother, and the fact that this was a major issue when the dependency began, it cannot be determined if she is currently using drugs because she refuses to do her court-ordered random UA testing as well as her more recently ordered hair follicle test. Therefore, this remains a significant issue." FF 2.30 (challenged).

- "The mother has refused or failed to do any of the required UA testing or the hair follicle test." FF 2.85 (unchallenged).

- "The mother completed a drug and alcohol evaluation in April 2015 but she was not forthcoming, and the assessment was inconclusive. The Department referred her to an additional evaluation with Sea Mar, and she failed to do it without any justification." FF 2.84 (challenged).

Employment and housing:

- "In addition, there is a substantial issue as to whether the mother even has a place to care for the children if they were to be returned to her care. She is currently living with [two named individuals] in a two-bedroom, two-bathroom trailer . . . . [One of them] has an organic brain disorder and is unemployed. [The other] is disabled and the mother provides some care for her." FF 2.129 (unchallenged).

- "There was no evidence to indicate that [the owner of the trailer] would consent to the children living in the trailer. [One of the individuals] testified that there are plans to remodel the trailer to accommodate the children and that he would move out if the children come to live there. Even if that were true, it would be a very poor living situation with two adults and three children living in a small trailer. There was also no satisfactory explanation concerning how two boys and one girl could be appropriately accommodated in the trailer." FF 2.130 (unchallenged).

- "Furthermore, the mother has not had regular employment during the course of these proceedings and it is highly questionable whether she could provide for the children's needs of food and shelter if they ever were to be returned to her care." FF 2.131 (unchallenged).

Visitation:

- "The court also notes that there have been chronic problems regarding the mother's visitation with the children. The parties argued for their respective interpretations of how many visits the mother missed or was late for. The Court notes there were 85 potential visits. The mother missed some 27 of these visits, and was late for 12 more. By any measure, that is a lot of missed visits." FF 2.120 (challenged).

- "The mother had no excuse for most of her missed visits. The mother did not work much during the pendency of these proceedings and the Department provided gas money and ferry fare to assist the mother in transportation." FF 2.121 (unchallenged).

5

The order concludes that the State proved all requirements imposed by the termination statute, RCW 13.34.180, and that termination served the children's best interests. FF 2.86-89, 2.106, 2.113, 2.114, 2.115, 2.128.

The mother appeals from the termination order. She argues that two statutory requirements, RCW 13.34.180(1)(e) and (f), lack evidentiary support and it was error to deny her request to delay entry of the termination order. She also challenges the trial court's denial of her motion for a final visit with her children.

## LIKELIHOOD CONDITIONS WILL BE REMEDIED

Parents have a fundamental liberty interest in the care, custody, and companionship of their children, but the right is not absolute; when parental actions or decisions seriously conflict with the child's physical or mental health, the State has a right and responsibility to intervene. In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016). Termination of parental rights is warranted only when six conditions are shown by clear, cogent, and convincing evidence, meaning the ultimate facts are shown to be "'highly probable.'" RCW 13.34.190(1)(a)(i); K.M.M., 186 Wn.2d at 478, quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (internal quotation marks omitted). The mother challenges the adequacy of evidence supporting the requirement that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). "A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable

6

presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e); see also In re Welfare of T.B., 150 Wn. App. 599, 608, 209 P.3d 497 (2009).

The presumption applies here. As of trial, the dependency proceedings had been going on for over two years. FF 2.135-136 (unchallenged). The mother does not dispute the finding of current parental unfitness. FF 2.107 (unchallenged). She contends the presumption is rebutted by testimony from Dr. Sierra Swing. Swing is a clinical psychologist who evaluated the mother on two occasions, once in 2015 and once in 2016. Report of Proceedings at 191, 196, 229; see also FF 2.41-42, 2.49-61, 2.69-77. At trial, Swing testified on cross-examination that the mother could make progress if given an additional six months:

> [SWING:] . . . there are several risk factors that are present in her relationship with her children that are concerning and she's been given several opportunities to address those concerns, even if they are not things that she feels that needs to be addressed. It's concerning that she hasn't done them just for the sake of getting her children back.
> Do I think that she has the ability to do it and be a good parent and learn new skills? Yes, I do. And I -- but at the same time, how many opportunities does she need to have in order to prove that she can do these things that are recommended?
> [COUNSEL FOR THE MOTHER:] And I do understand that. And, frankly, I do -- I understand too well some of your opinions, but I -- nonetheless, *were the Court to give her six more months to buckle down and do what she should have done a long time ago, would that, first of all, enter -- well, is that a workable proposal?*
> [SWING:] *Sure. It would take a lot of effort by [the mother] and a lot of consistency and follow-through but I don't think it's impossible.*
> [COUNSEL:] Would you recommend it?
> [SWING:] Yeah. If this was the last additional six months.
> [COUNSEL:] The last straw. And I do --

[SWING:] And if she understands that. I think that that's part of the difficulty is that I don't know how clearly she's understood whether or not this was the -- this is the consequence for her lack of participation. You know, maybe at this point she may recognize the seriousness of it and that will help motivate her. I hope that it does.

Report of Proceedings at 252-54 (emphasis added).

During cross-examination by the father's lawyer, Swing testified that an additional six months would provide better indication as to whether the mother should lose her parental rights:

[COUNSEL:] So to clarify, is it your testimony that if she got into treatment tomorrow, that it would take six months before -- of solid work, that she would be in a position to be able to care for all three of her children?

[SWING:] It would be a better indication as to whether or not she should lose her parental rights. I think that -- I think several things need to happen in order for [the mother] to safely and effectively care for her children.

I think she needs to -- someone needs to evaluate her to determine whether or not substance abuse is an issue. Someone -- I would strongly recommend that she participate in parenting classes. I'm very aware that she did this in 2012 and doesn't feel the need to do it. I think there are additional skills that would be helpful for her to learn.

I think that she should be evaluated by a psychiatrist and potentially try medication to see if stimulant medication would be helpful in improving her attention difficulties. Her -- and could actually keep her on task and make her more adaptable to change and help her with her follow-through. Maybe that should happen first.

And then engagement in therapy. Again, I don't know if she's at a place where she can participate in insight-oriented therapy, but at the very least learn skills and clearly applying them in her parenting and then demonstrating that she has a safe place for her children to live with her. If she can do that in six months, maybe that could -- maybe that is possible for her to work towards getting her children back. But, again, it's difficult to say based on her previous behavior.

Report of Proceedings at 254-55.

During cross-examination by counsel for one of the children, Swing testified that the mother had not engaged in the treatment that Swing had previously recommended:

> [COUNSEL:] So you recommended that she engage in counseling for at least -- twice a month for at least 12 months?
> [SWING:] After my previous -- my initial evaluation, yes.
> [COUNSEL:] And to your knowledge, did she do that?
> [SWING:] Not to my knowledge.
> [COUNSEL:] And you would recommend at this point that she do an alcohol and drug assessment?
> [SWING:] I recommend that in my initial evaluation, yes.
> [COUNSEL:] And over the last 12 months, to your knowledge, has she done that?
> [SWING:] Not to my knowledge.
> [COUNSEL:] What other recommendations did you make or acts for her to do back in October 2015?
> [SWING:] I don't remember specifically. It was primarily around engaging in therapy, potentially doing additional parenting classes, doing her drug and alcohol evaluation, and then finding and having a stable place for her children to live potentially.
> [COUNSEL:] So those are the same recommendations that you just made now if she were to get another six months that she would need to do?
> [SWING:] That, in addition to trying medication for ADHD.
> [COUNSEL:] And to your knowledge, over the last 12 months since you initially made those recommendations, has she done any of the things you recommended?
> [SWING:] Not to my knowledge.
> [COUNSEL:] So in theory, if she was given another six months to do what she hasn't done over the past 12 months, she might be in a position to maybe care for her children; is that your testimony today?
> [SWING:] That sounds not very good, but, yes.

Report of Proceedings at 260-61.

Appellant argues that Swing's testimony combined with evidence that the mother had begun therapy when trial occurred rebuts the presumption that she could not correct parental deficiencies in the near future. We disagree with this analysis. The portions of Swing's testimony relied on by appellant are largely

9

speculative. Swing said that it was not impossible for the mother to make progress in the next six months but that she would need to demonstrate "a lot of consistency and follow-through." Report of Proceedings at 253. Swing testified it was "possible for her to work towards getting her children back. But, again, it's difficult to say based on her previous behavior." Report of Proceedings at 255. This testimony does not outweigh evidence that the mother's engagement with services during the dependency process was minimal. Her current involvement in therapy is commendable. But this fact and Swing's testimony create, at best, a mere possibility that within the next six months the mother could obtain necessary treatment and her parenting abilities would improve to a meaningful extent. This possibility is insufficient to rebut the presumption in RCW 13.34.180(1)(e). The trial court correctly found the requirement met by clear, cogent, and convincing evidence.

What constitutes the "near future" is determined from the child's point of view. In re Dependency of A.C., 123 Wn. App. 244, 249, 98 P.3d 89 (2004). The mother argues that six months is within the "near future" based on the ages of her children and the circumstances of their current placements. We need not decide this issue. Even assuming the mother is correct, Swing's testimony is insufficient to rebut the presumption in RCW 13.34.180(1)(e).

### EFFECT OF CONTINUED PARENT-CHILD RELATIONSHIP

The mother challenges the adequacy of evidence supporting another condition: "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home."

RCW 13.34.180(1)(f). This factor "is mainly concerned with the continued effect of the *legal* relationship between parent and child, as an obstacle to adoption; it is especially a concern where children have potential adoption resources." A.C., 123 Wn. App. at 250.

As of trial, the children were living with members of the father's family. Report of Proceedings at 91-92, 102. Those placements are described in the trial court order as "prospective adoptive homes." FF 2.116 (unchallenged). Adoption "was identified as the permanency plan for the children in permanency planning orders entered on February 17, 2016. That was 19 months after the children were placed in out-of-home care. It was four months beyond the identified timeline under RCW 13.34.145(1)(c) that permanency for the children should be achieved, not just identified." FF 2.136 (unchallenged). "The testimony and other evidence was clear that the current placements were not willing to consider guardianship as an option for these children." FF 2.133 (unchallenged).

Appellant claims the relationships between her children and their relatives will continue even if the termination order does not take effect for an additional six months. Nonetheless, the effect of the continued legal relationship between the mother and her children is that the adoptions currently cannot go forward.

The trial court found, "The children are all doing well in their prospective adoptive homes. They have made good progress in all aspects of their personal lives since being removed from the mother's care." FF 2.116 (unchallenged).

Advocates reported that the children were "happy" and "thriving" in their placements. FF 2.118-119 (unchallenged).

The record contains testimony that allowing the dependency process to continue would inhibit the children from settling into normal routines and feeling secure in their current placements. A social worker for the family testified that continuation of the parent-child relationship would keep the children "in limbo":

> [STATE:] Do you have an opinion, then, as to whether or not continuation of the parent-child relationship would interfere with the children being able to have a stable and permanent home?
> [MCGEE:] As it is right now, yes.
> [STATE:] And why is that?
> [MCGEE:] Because right now the continuation of the parent-child relationship means coming to a DCFS office for a visit, means that it prevents them from having a normal daily routine that a child has in their life, where they can sign up for boxing and band and sleepovers with friends, they can have friends over to their house. Everything that a child experiences on a daily basis is somehow affected by an ongoing dependency case.
> The continuation of the relationship between the parent and the child on this level just keeps them in limbo. They don't know when it's going to end and they don't really know what forever is and where that's going to be.

Report of Proceedings at 138.

Another social worker provided similar testimony, stating that continuation of the parent-child relationship would leave the children uncertain about where they belonged, particularly given the mother's inconsistency in attending scheduled visitation:

> Again, referring back to the visitation specifically, she's missed 50 percent of the visits. Since I obtained the case in mid-July, she's missed 50 percent of the visits. She's confirmed them beforehand. The children were transported to the office. They missed other activities that they wanted to do. They get transported for hours depending on where they're coming from.

They'll be in limbo. They won't really know kind of where -- here or there or who family is. I think for them they would be limited in regards to what family looks like. What's that going to be like for them and really feeling safe and stable. And they need that. They've had so much instability and if they continue the visits, it's just going to continue.

Report of Proceedings at 469.

The record adequately supports that continuation of the parent-child relationship diminishes the children's prospects for early integration into a stable and permanent home. The trial court correctly found that RCW 13.34.180(1)(f) is satisfied in the present case.

Having rejected both of the mother's challenges under RCW 13.34.180(1), we conclude the trial court did not abuse its discretion by denying her motion to stay entry of the termination order or continue the matter for six months. The mother sought a stay or continuance on the basis that she should be granted additional time to demonstrate progress in her treatment. It was not manifestly unreasonable to deny this request given the evidence before the trial court.

## MOTION FOR FINAL VISIT

On January 5, 2017, the day before entry of the termination order, counsel for the mother orally requested that the mother be allowed a final visit with her children. Counsel for the State responded that the motion was not properly before the court. Counsel also said, "There was some concerns about the impact on the younger two children." The court ruled, "It's not before me in any formal manner so I'll just note [defense counsel's] comments and leave it at that." Defense counsel said that he would "file something formally."

13

During a hearing the next day, the parties resumed discussion of whether the mother was entitled to a final visit. Counsel for the State said that he still had not received a hard copy of the motion and asked that the motion be denied: "Your Honor, I think it's not timely. I'm going to just ask Your Honor to deny it on those grounds. It's also technically not in the correct cause numbers since it was filed in the termination cause numbers and not the underlying dependency." Report of Proceedings at 935-36. The court agreed:

> It is not timely. So I will not hear it today. The proper notice should be given to all parties. I think [the State] is also correct that this is filed improperly in the termination cases. It should have been filed in the dependency cases. And I'll just leave it at that. This would be something that would typically be heard by the court commissioner on the Wednesday calendar.

The court told defense counsel to schedule the matter "for the 9:30 Wednesday calendar with proper notice."

On appeal, the mother claims the trial court erred by "summarily dismissing" her motion on procedural grounds when she "had previously made requests for the visits to which she was entitled until her termination became final." Brief of Appellant at 26. The mother does not explain why the motion should have been granted despite the apparent notice problem. The trial court decision allowed her to pursue the matter before a commissioner, with proper notice to the State. It is not clear whether she pursued this option. The mother has not shown the trial court's decision was erroneous.

The mother assigns error to a number of specific factual findings in the termination order on the basis that they are not supported by substantial evidence. Her brief does not contain discussion in support of these assignments

14

of error. In any event, the challenged findings, many of which relate to the mother's alleged substance abuse and the missed visitation appointments, are adequately supported by the record.

In sum, we find no basis for reversal. "Courts are always reluctant to deprive parents of rights with respect to their children, and it is particularly sad when the parent cares for the child and desires to be a good parent, as appears to be the case here." In re Aschauer's Welfare, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). But "it is the court's duty to see that those rights yield, when to accord them dominance would be to ignore the needs of the child." Aschauer, 93 Wn.2d 695.

Affirmed.

Becker, J.

WE CONCUR:

Mann, J.                    Trickey, A.C.J.