# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>D.W.H. (DOB: 04/27/2014),<br><br>J.C.W. (DOB: 09/03/2015),<br><br>        Minor children.<br><br>LISA HARRISON,<br><br>        Appellant,<br><br>    v.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF CHILDREN,<br>YOUTH AND FAMILIES,<br><br>        Respondent. | No. 79370-5-I (consolidated with No. 79371-3-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br><br><br><br><br><br>FILED: January 13, 2020 |

DWYER, J. — Lisa Harrison appeals the termination of her parental rights to her sons D.W.H. and J.C.W. She argues that the Department of Children, Youth and Families failed to prove that it provided all necessary and reasonably available services to her because the services were not tailored to her cognitive and intellectual disabilities. We affirm.

I

D.W.H. and J.C.W. were born to Harrison in 2014 and 2015, respectively.[1] Both children have special medical needs. D.W.H. presents "a moderate level of autism spectrum related symptoms." He has a speech delay, sleep apnea and asthma, which requires medication on a specific dosing schedule. J.C.W. has dysphagia, a condition that makes swallowing difficult. He is unable to drink liquids by mouth because of the likelihood he will aspirate the liquid into his lungs. He has a gastrostomy tube in his abdomen through which he receives liquids. J.C.W. also has some developmental delays and behavior challenges.

The Department became involved with Harrison in early 2016, when it received reports that both children were left alone for long periods with minimal interaction or supervision, that Harrison failed to get care for the children's developmental delays, and that Harrison's home was so dirty and cluttered that it presented a safety threat. The Department offered Family Preservation Services, an in-home counseling service, to help Harrison obtain stable housing, get help with her mental health, and learn parenting skills. Harrison was initially motivated, but after the first month she began cancelling or failing to show up for counseling sessions. By the third month, she had dropped out entirely.

The Department filed a dependency petition and a juvenile court removed D.W.H. and J.C.W. In their foster home, the children would eat until they threw up and D.W.H. would forage through garbage cans looking for food.

---

[1] During the dependency proceedings, Harrison gave birth to a third child, A.H. A juvenile court also removed A.H. from Harrison's care. A.H. is not a subject of these termination proceedings.

2

Harrison signed an agreed order establishing that D.W.H. and J.C.W. were dependent children. The order allowed Harrison supervised visits with the children and required Harrison to undergo a psychological evaluation and submit to random urinalysis testing.[2]

A Department social worker also set Harrison up with Project SafeCare, an intensive in-home parenting training program that covers three modules: (1) child health and injury, (2) appropriate parent-child interaction, and (3) home safety. Project SafeCare therapist Tamas Mihaly began working one-on-one with Harrison in December 2016. But Mihaly had extreme difficulty scheduling with Harrison, who ignored his phone calls or told him she was too busy to talk to him. According to Mihaly, each module requires at least five or six weeks of weekly sessions. Harrison attended only an introductory appointment in December, one session in January, and one session in February. Harrison did not progress in the Project SafeCare curriculum because she cancelled a great number of sessions. Mihaly terminated Harrison's participation in the program.

Dr. Tatyana Shepel conducted Harrison's psychological evaluation in early 2017. She administered psychological testing, observed a visit between Harrison and the children, and conducted a clinical interview. During the parent-child visit, Dr. Shepel observed that Harrison interacted positively and affectionately with D.W.H. and J.C.W. But the psychological testing revealed that Harrison had very poor reading comprehension and her working memory was "normatively

---

[2] Harrison successfully completed the urinalysis testing requirement. There is no evidence in the record that substance abuse was a parental deficiency.

3

impaired, better than only three percent of adults in her age group."[3] And during the clinical interview, Harrison was dismissive of the Department's concerns regarding the children's developmental delays. She exhibited "very little insight into what happened to the children while they were in her care and why they required such intensive medical and mental health interventions to address their delays."

Dr. Shepel diagnosed Harrison with attention deficit hyperactivity disorder (ADHD) and personality disorder not otherwise specified with dependent personality traits. She concluded that ADHD was the principal basis for Harrison's parental deficiencies.

> I did see in the history periods of short improvement, brief engagement of services, and then avoidant behaviors, inability to maintain the consistency of visitations, mental health appointments and other appointments. So this is typical for people with ADHD, because part of the ADHD diagnosis is executive functioning impairment, which is, if you think about executive functioning, that's higher levels of functioning, mental cognition, and person is able to organize and executive [sic] steps and achieve goals, rather than be impulsive, destructive, and having multiple excuses as to why they couldn't precede with the plan. So for people with untreated ADHD, it's very typical they can shortly, briefly engage, work, family obligations, education, but then they reverse to previous dysfunctional disorganization and dysfunctional patterns.

Dr. Shepel's primary recommendation was that Harrison see a psychiatrist to treat her ADHD, which would improve Harrison's attention span, focus, and "ability to follow through on complex tasks that require sequence of steps."[4]

Second, Dr. Shepel recommended intensive mental health counseling—

---

[3] Dr. Shepel explained that "working memory" is the ability to both retain information and later use that information in some way.

[4] There is no evidence in the record that Harrison ever received psychiatric treatment for ADHD. Harrison testified at trial that she was taking an unspecified medication for PTSD symptoms.

specifically, dialectical behavioral therapy (DBT)—to help Harrison learn coping skills and take responsibility for her life choices. Third, Dr. Shepel recommended Harrison work with a life skills coach to learn how to manage household responsibilities and be on time for appointments. Finally, Dr. Shepel recommended Harrison receive parenting skills training. According to Dr. Shepel, the parenting skills training should be offered one-on-one rather than in a group setting because Harrison needed lots of repetition to ensure that she was retaining the information.

> Again, with a parent with similar to Miss Harrison's neurocognitive makeup, such as attention deficit hyperactivity disorder and educational needs for reading comprehension, just by being in a group format in a class due to poor working memory, there is a chance of missing out on important information, not understanding complex concepts, and also not being able to read complex reading material that is – typically, there are handouts or PowerPoint presentations.
>
> So one-on-one training would ensure comprehension of instructions, repetition and rehearsal, and the professional is able to check if Miss Harrison did in fact retain information, and if she's able to apply new information in her parenting.

Dr. Shepel concluded that Harrison's prognosis was "guarded" because of the severity and chronicity of her ADHD, and because personality disorders are very difficult to treat.

Following Dr. Shepel's evaluation, the Department again referred Harrison for parenting skills training with Project SafeCare. Therapist Parzival Popof began working with Harrison in April 2017. As before, Harrison frequently cancelled the sessions. Consequently, Popof spent much of the time reviewing material that Harrison forgot in the weeks between sessions. Harrison ultimately

completed the curriculum, but it took her nine months, which Popof described as an "unusually long" time.

From early 2017 until June 2018, D.W.H. and J.C.W. attended Childhaven, a developmental preschool for children who have suffered abuse or neglect. During that time, Harrison was able to frequently visit Childhaven and receive hands-on parent coaching there. Sarah Kier, a Childhaven family therapist, testified that she coached Harrison on how to focus on the children's needs and ensure their safety. She also provided Harrison a great deal of emotional support so that Harrison did not become overwhelmed and anxious around the children. Kier met one-on-one with Harrison multiple times a week, both in person and over the phone. She testified that, despite this level of support, she did not believe that Harrison was capable of handling the children unsupervised.

In November 2017, Harrison began participating in individual mental health counseling, DBT group therapy, and a domestic violence group at Navos Mental Health. Christine Peterson, Harrison's individual mental health counselor, reviewed and considered Dr. Shepel's evaluation regarding Harrison's needs and limitations. But by May 2018, Harrison stopped attending counseling sessions with Peterson. Though Peterson frequently talked to Harrison on the telephone, trying to determine what barriers kept her from attending, Peterson never returned to counseling.

In February 2018, the Department referred Harrison to John Pringle, a Family Preservation Services provider, for life skills training. The Department

notified Pringle that Harrison "exhibits impairment in executive functioning, self-monitoring, planning and sequencing." Pringle met weekly with Harrison to work on skills like budgeting and scheduling. Pringle suggested Harrison get a calendar so she could keep track of her appointments. Eventually, Harrison obtained one, but would still sometimes cancel meetings with Pringle at the last minute. During meetings she did attend, Harrison got distracted by her cell phone or sidetracked with various grievances against the Department.

After three months of work, Harrison did not make significant progress in the area of life skills. The Department requested Pringle work with Harrison for another three months, and to introduce parent coaching at Harrison's supervised visits. This time, the Department social worker wrote on the referral form:

> Instructions should be simplified, sequenced, and repeated to ensure comprehension. Mother has limited attention and moderate neurocognitive deficits and dependent personality features.

Pringle observed that Harrison was unable to focus on more than one child at a time and frequently lost track of where they were. Pringle coached Harrison on how she could improve her ability to supervise them. But Harrison told Pringle "she didn't need [his] program or [his] assistance because she thought she was doing everything correctly for her kids." After six months, Pringle's agency declined to work with Harrison anymore due to her lack of progress.

The Department filed a petition to terminate Harrison's parental rights to D.W.H. and J.C.W., alleging that the children were "at risk of neglect in her care due to her ongoing mental health concerns and lack of understanding of the

7

needs of her children." While the trial was pending, the Department continued to offer services to Harrison. In November 2018, the Department referred Harrison to Simone Walcott for hands-on parent coaching. Prior to meeting with Harrison, Walcott reviewed Dr. Shepel's evaluation. Walcott testified that she would observe Harrison's supervised visits, provide suggestions and feedback, and then call Harrison in between the visits in order to further review Harrison's skills. Despite the fact that Harrison had several rounds of parent coaching, Walcott still observed safety concerns at the visits. For example, the children repeatedly climbed on top of furniture and J.C.W. grabbed a water bottle and tried to drink from it. The visit supervisor had to intervene to take the water bottle away and remind Harrison to do so. Harrison also required multiple prompts before she would change the children's diapers.

A termination trial took place over the course of five days in December 2018. At the time of the trial, D.W.H. was approximately four and a half years old and J.C.W. was approximately three and a half years old. They had been out of Harrison's care for two and a half years. The trial court reviewed 41 exhibits and heard the testimony of 16 witnesses, including the mother, Dr. Shepel, the court appointed special advocate, three Department social workers, Mihaly, Popof, Pringle, Peterson, and Wolcott. The trial court entered findings of fact, conclusions of law, and an order terminating Harrison's parental rights.[5] Harrison appeals.

---

[5] The parental rights of the children's fathers were terminated by separate order and are not at issue in this appeal.

II

Parents enjoy fundamental liberty interests in the continued care, custody, and companionship of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L.Ed. 2d 599 (1982). Termination of the parent-child relationship involves a two-step process. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, the Department must prove the six termination factors set forth in RCW 13.34.180(1) by clear, cogent, and convincing evidence. A.B., 168 Wn.2d at 911-12. One of these factors is whether the Department has provided all the services ordered as part of the dependency proceedings, as well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). If this burden is satisfied, the court must also find by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190; In re Dependency of K.N.J., 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).

Where, as here, the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the court's findings of fact and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). Unchallenged findings of fact are verities on appeal. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Challenged findings will be upheld "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Clear, cogent, and convincing evidence exists when

the ultimate fact in issue is shown to be "'highly probable.'" In re Dependency of T.L.G., 126 Wn. App. 181, 197, 108 P.3d 156 (2005) (quoting In re Dependency of H.W., 92 Wn. App. 420, 425, 961 P.2d 963, 969 P.2d 1082 (1998)). We defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence. In re Welfare of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011). Such deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her." A.W., 182 Wn.2d at 711.

III

Harrison argues that the Department failed to prove that it offered or provided her all reasonably available, necessary services because it did not tailor those services to accommodate her neurocognitive limitations.

The Department has a statutory obligation to provide all the services ordered by the permanency plan, as well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d); In re Parental Rights to K.M.M., 186 Wn.2d 466, 479, 379 P.3d 75 (2016). The services offered must be specifically tailored to the parent's unique needs. In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001); S.J., 162 Wn. App. at 881.

To accommodate Harrison's ADHD and poor working memory, Dr. Shepel recommended that parenting skills training be provided one-on-one so that the provider could ensure Harrison was understanding the information and repeat

10

information if necessary. Contrary to Harrison's claim, the Department did so. All of Harrison's parenting instruction was provided one-on-one. While several of Harrison's service providers testified Harrison was easily distractible, none of them stated that she appeared to have difficulty understanding the information provided. Mihaly testified that he did not use written materials with Harrison, and that he devoted more time than he typically would have to try to get Harrison to meet with him. Popof testified that he went over the material with Harrison multiple times, and that if Harrison missed sessions, he made sure to review what they had discussed previously. Kier provided individualized hands-on support and coaching when Harrison visited the children at Childhaven. And Wolcott also provided concrete, hands-on coaching at visits and called Harrison in between visits to review these suggestions. The record does not support Harrison's claim that the Department failed to provide the type of parent coaching recommended by Dr. Shepel.

But even if the Department had failed to offer services to accommodate Harrison, the record demonstrates that additional services would not have corrected Harrison's parental deficiencies in the foreseeable future. Termination is appropriate "even where the State inexcusably fails to offer a service to a willing parent . . . if the service would not have remedied the parent's deficiencies in the foreseeable future, which depends on the age of the child." T.R., 108 Wn. App. at 164. This means that when the record establishes that an offer of services would have been futile, the trial court can make a finding that the

11

Department has offered all reasonable services. In re Welfare of M.R.H., 145 Wn. App. 10, 25, 188 P.3d 510 (2008).

Here, the trial court found that the children, due to their age, were unable to conceive of the future beyond about seven days. Harrison does not specifically challenge this finding and it is a verity on appeal. And even after two years of hands-on parenting coaching, Harrison could not have safely cared for the children without supervision and support. The evidence indicates that additional services would not have remedied Harrison's deficiencies in the foreseeable future for the children. Substantial evidence supports the trial court's finding that providing additional services would be futile.

Harrison compares this case to In re Dependency of I.M.-M., 196 Wn. App. 914, 385 P.3d 268 (2016). In I.M.-M., the children were removed from their mother due to her substance abuse. The dependency petition noted that the mother had low cognitive functioning and was described as "DD." The mother was ordered to participate in a psychological evaluation, which revealed that she was "significantly cognitively impaired" with an IQ "lower than 91 percent of individuals her age", raising "concerns about her . . . ability to hold a job, pay bills, [and] take care of herself." I.M.-M., 196 Wn. App. at 918. The evaluation suggested the mother would "be slow to grasp information and would require repetition in order to learn new skills." I.M.-M., 196 Wn. App. at 918. The psychologist who performed the evaluation believed the mother's impairments would not be readily apparent to service providers because she "demonstrated strong street smarts and had become very good at reading social cues and

presenting herself socially in a way that probably masks her intellectual deficits." I.M.-M., 196 Wn. App. at 918 (internal quotation marks omitted). The psychological evaluation was never shared with the mother or her service providers. The mother struggled to make progress in services "even while dutifully showing up for most appointments" and her parental rights were terminated. I.M.-M., 196 Wn. App. at 928. Division Three of this court held that the Department failed to provide all necessary services as required by RCW 13.34.180(1)(d) because the Department did not thoroughly investigate the mother's unspecified developmental disability nor tailor its services to her apparent needs.

I.M.-M. is distinguishable. Here, Dr. Shepel reached a specific diagnosis: ADHD. Harrison's providers had either received Dr. Shepel's report or were otherwise aware that Harrison would benefit from a hands-on approach to learning. Moreover, unlike the parent in I.M.-M., Harrison's participation in services was often unenthusiastic and she frequently cancelled appointments.

For the first time on appeal, Harrison argues that the Department did not meet its burden to offer or provide services because it did not consult with the Developmental Disabilities Administration (DDA) to determine if she was eligible for DDA services. RCW 13.34.136(2)(B) provides that "[i]f a parent has a developmental disability according to the definition provided in RCW 71A.10.020, and that individual is eligible for services provided by the department of social and health services developmental disabilities administration, the department shall make reasonable efforts to consult with the department of social and health

services developmental disabilities administration to create an appropriate plan for services."[6] But Harrison did not raise this issue below. Consequently, there is no evidence in the record regarding the Department's efforts or Harrison's eligibility. The record is thus insufficient to permit meaningful review of this claim.

Affirmed.

WE CONCUR:

---

[6] A "developmental disability" is "a disability attributable to intellectual disability, cerebral palsy, epilepsy, autism, or another neurological or other condition of an individual found by the secretary to be closely related to an intellectual disability or to require treatment similar to that required for individuals with intellectual disabilities, which disability originates before the individual attains age eighteen, which has continued or can be expected to continue indefinitely, and which constitutes a substantial limitation to the individual." RCW 71A.10.020(5).